The WOMEN OF the STATE OF MINNESOTA, as represented by Jane DOE, et al., Respondents,

v.

Maria R. GOMEZ, in her official capacity as the Commissioner of Human Services, Appellant,

Hennepin County Board, Ramsey County Board, St. Louis County Board, Respondents.

No. CX–94–1442.

Supreme Court of Minnesota.

Dec. 15, 1995.

Hubert H. Humphrey, III, Atty. Gen., Patricia A. Sonnenberg, Asst. Atty. Gen., St. Paul, for appellant.

Simon Heller, Janet Benshoof, New York City, Linda Ojala, Minneapolis, for respondents Jane Doe, Jane Hodgson, M.D., Pro-Choice Resources, Women's Health Center of Duluth, Midwest Health Center for Women, and Meadowbrook Women's Clinic.

Michael O. Freeman, Hennepin Co. Atty., Martin Munic, Asst. Hennepin Co. Atty., Minneapolis, for respondent Hennepin Co. Bd.

C. David Dietz, Asst. Ramsey Co. Atty., St. Paul, for respondent Ramsey Co. Bd.

Clay Odden, Duluth, for respondent St. Louis Co. Bd.

Creighton R. Magid, Stacey M. Fuller, Dorsey & Whitney, Minneapolis, for amicus Minnesota Civ. Liberties Union.

Barry W. McKee, Stillwater, for amicus Pro-Life Action Ministries, Inc.

Eric J. Magnuson, David F. Fitzgerald, Gregory M. Weyandt, Minneapolis, for amicus Minnesota Lawyers for Life, Inc.

## OPINION

KEITH, Chief Justice.

In this appeal, we are called upon to assess the validity under the Minnesota Constitution of statutes that restrict the use of public funds for abortion-related medical services to three limited circumstances while permitting the use of such funds for comprehensive childbirth-related medical services. Plaintiffs contend that this selective funding scheme violates a woman's right to privacy and equal protection of the law because it denies medical benefits to otherwise qualified women solely because they seek to exercise their constitutional right to procreative choice in a manner which the State does not approve.

In light of the emotional and political overtones of the abortion issue in this country, we must emphasize that this case presents a very narrow legal issue. This opinion is not based upon the morality or immorality of abortion, or the ethical considerations involved in a woman's individual decision whether or not to bear a child. In this case, the Minnesota legislature has adopted certain restrictions which impact poor women who, for medical reasons or because of rape

or incest, choose to have an abortion. A similar constitutional challenge would certainly arise if the Minnesota legislature funded abortions for qualified women to limit the population of the poor, but refused to provide medical care for poor women who choose childbirth. Thus, the constitutional issues in this case concern the protection of *either* choice from discriminatory governmental treatment.

Both parties agree that women have a fundamental right to obtain an abortion before fetal viability under the Minnesota and United States Constitutions. However, plaintiffs assert that the statutory scheme at issue in this case infringes upon this fundamental right to privacy, and therefore must be subjected to strict scrutiny by this court. *See Skeen v. State,* 505 N.W.2d 299, 312 (Minn.1993) (statutes which impinge upon a fundamental right are subject to strict scrutiny by the judiciary). Because we agree with plaintiffs and because the State has not convinced us that the statutes in question are necessary to promote a compelling governmental interest, we hold that the challenged provisions are unconstitutional. Our decision is only based upon this court's determination that a pregnant woman, who is eligible for medical assistance and is considering an abortion for therapeutic reasons, cannot be coerced into choosing childbirth over abortion by a legislated funding policy. In reaching our decision, we have interpreted the Minnesota Constitution to afford broader protection than the United States Constitution of a woman's fundamental right to reach a private decision on whether to obtain an abortion, and thus reject the United States Supreme Court's opinion on this issue in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). We conclude that the challenged provisions impermissibly infringe upon a woman's fundamental right of privacy under Article I, Sections 2, 7 and 10 of the Minnesota Constitution. Accordingly, we affirm the district court, and therefore find it unnecessary to address the equal protection arguments raised by the plaintiffs.[1]

---

1. The dissent makes much of the plaintiffs' equal protection claims, arguing that the funding re-

strictions at issue in this case are rationally related to several important governmental interests,

## I.

On March 8, 1993, plaintiffs filed suit in Hennepin County District Court seeking declaratory and injunctive relief against the State of Minnesota Commissioner of Human Services (the "State"), the Commissioners of Hennepin County, the Commissioners of Ramsey County, and the Commissioners of St. Louis County.[2] Plaintiffs alleged constitutional violations arising out of statutory provisions that restrict the use of public medical assistance and general assistance funds for therapeutic abortion services. Plaintiffs sought an injunction against the enforcement of the challenged provisions and a declaration that the provisions violated the Minnesota Constitution.

Both the State and Ramsey County moved to dismiss. Shortly thereafter, plaintiffs moved for class certification. In its order filed July 15, 1993, the district court denied the motions to dismiss and granted certification. The court certified:

the class of all women eligible for Minnesota's Medical Assistance, General Assistance Medical Care, or County Poor Relief programs, who seek abortions for health reasons during the pendency of this litigation or have obtained abortions for health

such as discouraging the fabrication of rape and incest claims and encouraging early reports to law enforcement authorities. Even if the dissent's and the State's explanations of the equal protection issue were correct, however, the statutory scheme would still be an unconstitutional interference with a woman's right to privacy, leading us to the same result.

2. "Plaintiffs" refers to all plaintiffs below, including those added by amended complaint on April 13, 1993, now situated as respondents on appeal.

The plaintiff identified as Jane Doe is an African–American mother of two who resided in Hennepin County and was eligible for medical assistance ("MA") at the time of the complaint. The complaint asserts she sought an abortion for a pregnancy resulting from rape, but was unable to obtain MA coverage because she did not report the rape within 48 hours to law enforcement authorities. On March 15, 1993, she obtained an abortion with financial assistance from Pro–Choice Resources.

Plaintiff Jane Hodgson, M.D. is a physician specializing in obstetrics and gynecology and is a resident of St. Paul. She is a member of the Board of Directors of plaintiff Women's Health Center of Duluth and performs abortions at that facility.

Plaintiff Pro–Choice Resources ("PCR") is a non-profit organization that provides loans and grants to assist low-income women in obtaining abortions. PCR is funded solely by private donations and is the only fund of its type in Minnesota. Since 1977, when the challenged provisions eliminated state funding for abortions in Minnesota, PCR has given financial assistance to between four and five thousand women for reduced cost abortions or for alternatives to abortion. PCR receives roughly 2,500 requests for assistance per year and assists approximately 700 women per year. The fund distributes roughly $10,000 per month in loans and grants.

Plaintiff Women's Health Center of Duluth, PA ("WHC") is a private, non-profit corporation that provides approximately 90–100 abortions per month at its Duluth clinic. WHC provides abortions through the 15th week of pregnancy measured from the last menstrual period ("lmp") and refers women beyond 15 weeks lmp to providers in the Twin Cities. WHC's fee ranges from $330.00 for an abortion from 7 to 11 weeks lmp to $530.00 for an abortion at 15 weeks lmp.

Plaintiff Midwest Health Center for Women ("MHCW") is a private, non-profit corporation that provides abortion services and other reproductive health care for women through its Minneapolis clinic. Roughly 28% of MHCW's patients are MA recipients, and MHCW provides approximately 200 abortions per month for pregnancies up to 15 weeks lmp. Women on MA pay $200 for an abortion at 7 to 12 weeks lmp and $240 at 12 to 14 weeks lmp.

Plaintiff Meadowbrook Women's Clinic ("MWC") provides abortions and counselling services for women with pregnancies up to 21.6 weeks lmp. Women beyond 21.6 weeks lmp are referred to St. Paul Ramsey Fertility Control Clinic and women beyond 23 weeks lmp are referred to a provider in Kansas. Approximately 10% of MWC's patients are MA-eligible. MWC's abortion fees begin at $315 for a woman less than 12 weeks lmp and increase as the pregnancy progresses. At 21 to 21.6 weeks lmp, the fee is $1,200.00. These fees are reduced for women on MA by $110 for first trimester abortions and by $185 for second trimester abortions.

The defendants at the lower court were the Commissioner of Human Services of the State of Minnesota and the Hennepin, Ramsey and St. Louis County Boards of Commissioners. The Commissioner of Human Services and her successors in office were sued in their official capacity of being charged with administering Minnesota's medical assistance statutes and regulations. Minn.Stat. §§ 256B.04, subd. 1, 256D.04 (1992). The county boards were sued in their official capacities of being charged under Minnesota Statutes § 393.07(2) with administering "all forms of public welfare" within each board's respective county.

reasons within the one year period prior to the filing of this action.[3]

Following discovery, the State and the plaintiffs made cross-motions for summary judgment. In its order dated June 16, 1994, the district court denied the State's motion for summary judgment and granted the plaintiffs' motion for summary judgment in its entirety. The court struck Minnesota Statutes section 256B.0625, subdivision 16 as unconstitutional under the equal protection and privacy guarantees of Article I, Sections 2, 7, and 10 of the Minnesota Constitution and permanently enjoined the defendants from enforcing the challenged statutes and regulations.[4]

On June 23, 1994, the State filed a motion for a stay of enforcement of the judgment and for a suspension of the injunction issued by the district court. In its July 5, 1994 order, the district court denied the State's motion for a stay and reserved the issues of reimbursement to class members and of costs and reasonable disbursements until all appeals have been exhausted.

The State filed a notice of appeal to the Minnesota Court of Appeals on July 6, 1994 and filed a petition for accelerated review in this court on the same day. By an order dated July 29, 1994, this court granted the State's petition for accelerated review. In this appeal, we are asked to resolve the issues of whether the challenged provisions violate the equal protection guarantees or impermissibly infringe on a woman's fundamental right of privacy under the Minnesota Constitution.

3. Plaintiffs submitted affidavits of two women seeking to be added as plaintiffs in the class action, and also submitted seven other affidavits of women denied MA coverage for their abortions. The trial court identified all nine women as plaintiff class members and described their statements in its June 16, 1994 findings of facts. One additional affidavit was submitted by "Ann Doe" in opposition to defendants' motion for a stay pending appeal. It is unclear whether she is an additional plaintiff class member.

4. Specifically, the court enjoined defendants from enforcing Minnesota Statutes sections 256B.0625, subdivision 16, 256B.40, 393.07, subdivision 11, 261.28, and Minnesota Rule 9505.0220(q) and 9505.0235, subpart 2.

Before addressing the issues presented, however, it is important to note the statutory scheme and caselaw implicated in this appeal and the facts presented to the trial court prior to its decision.

## A. The Statutory Scheme and Related Caselaw

Created in 1965 under Title XIX of the Social Security Act, Medicaid is a joint federal-state entitlement program that provides medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care. 42 U.S.C. §§ 1396a–1396v (1988 & Supp. IV 1992); *see Atkins v. Rivera,* 477 U.S. 154, 156, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986). States are not required to participate in the Medicaid program, but once a state elects to participate, it must comply with the requirements of Title XIX. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Federal law sets out mandatory and optional categories of services funded under Medicaid. 42 U.S.C. §§ 1396a, 1396d(a) (1988 & Supp. IV 1992). The mandatory categories require a participating state to provide financial assistance to the "categorically needy"[5] with respect to five general areas of medical treatment.[6] *See* 42 U.S.C. § 1396a(a)(10)(A) (1988 & Supp. IV 1992); *McRae,* 448 U.S. at 301, 100 S.Ct. at 2680; *Atkins,* 477 U.S. at 157, 106 S.Ct. at 2458–59. The optional categories permit a participating state to provide additional medical benefits to the "medically needy."[7] *See* 42 U.S.C. §§ 1396a(a)(10)(C)

5. The "categorically needy" are persons eligible for cash assistance under either Supplemental Security Income for the Aged, Blind, and Disabled (SSI) or Aid to Families with Dependent Children (AFDC). *See Atkins,* 477 U.S. at 157, 106 S.Ct. at 2458.

6. These five areas include: (1) inpatient hospital services; (2) outpatient hospital services; (3) other laboratory and X-ray services; (4) skilled nursing facilities services, periodic screening and diagnosis of children, and family planning services; and (5) services of physicians. 42 U.S.C. § 1396d(a)(1–5)(1988 & Supp. V 1993).

7. "Medically needy" refers to persons who meet the nonfinancial eligibility requirements under

and 1396d(a) (1988 & Supp. IV 1992). Although the program does not identify specific types of medical treatment required under the program, the state's plan must establish "reasonable standards * * * consistent with the objectives of [Title XIX]" to determine what treatment is covered. 42 U.S.C. § 1396a(a)(17) (Supp. V 1993). Thus, Title XIX gives states "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.'" *Alexander v. Choate,* 469 U.S. 287, 303, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (citing 42 U.S.C. § 1396a(a)(19)).

The United States Supreme Court has, in several cases, addressed the issue of coverage for abortion services in light of Title XIX and the United States Constitution. In *Beal v. Doe,* the Court considered whether Title XIX requires participating states to fund the cost of nontherapeutic abortions. 432 U.S. 438, 440, 97 S.Ct. 2366, 2368, 53 L.Ed.2d 464 (1977). The Court held that a state's refusal to extend Medicaid coverage to nontherapeutic abortions does not conflict with Title XIX, although the state is free to provide such coverage if it so desires. *Beal,* 432 U.S. at 447, 97 S.Ct. at 2372. In the companion case, *Maher v. Roe,* the Court also held that neither the Equal Protection Clause nor the privacy right under the federal constitution requires a participating state that provides coverage for childbirth expenses also to provide coverage for nontherapeutic abortions. 432 U.S. 464, 471, 474, 97 S.Ct. 2376, 2381, 2382–83, 53 L.Ed.2d 484 (1977).

Further, Congress has since September 1976 restricted the use of federal funds for both therapeutic and nontherapeutic abor-

tions by amendment to the annual appropriations bill. *See McRae,* 448 U.S. at 302, 100 S.Ct. at 2680. This amendment is commonly referred to as the "Hyde Amendment," and at the time the complaint was filed in this case, it restricted the use of federal funds to reimburse only those abortions necessary to save a woman's life. Dept. of Health and Human Serv. Appropriations Act of 1991, Pub.L. No. 102–170, § 203, 105 Stat. 1107 (1991).[8]

In 1980, the Supreme Court addressed whether Title XIX requires states to provide services for which federal funding has been withheld under the Hyde Amendment. *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). The Court held that Congress' withdrawal of federal funding for abortions except under limited circumstances does not obligate participating states under Title XIX to continue to pay for that service as a condition of receiving federal financial support for other services. *Id.* at 309, 100 S.Ct. at 2684. At the same time, the Court considered the validity of the Hyde Amendment under the U.S. Constitution and found no violation of women's Fifth Amendment Due Process right to decide to terminate a pregnancy, no violation of the Establishment Clause of the First Amendment, and no violation of the equal protection component of the Due Process Clause of the Fifth Amendment. *See McRae,* 448 U.S. 297, 100 S.Ct. 2671. Thus, after *McRae,* states are free to fund medically necessary abortions at their own expense, but the Hyde Amendment prohibits federal reimbursement. *Id.* at 311 n. 16, 100 S.Ct. at 2685 n. 16.

Minnesota participates in the Medicaid program through its medical assistance program ("MA"), codified at Minnesota Statutes

AFDC or SSI, but whose income or resources exceed the eligibility cut-offs for those programs. *See Atkins,* 477 U.S. at 157, 106 S.Ct. at 2458.

**8.** In 1993, the Hyde Amendment was revised to expand the categories of abortions eligible for federal funds under Medicaid. Under this new law, the federal government also must provide abortions to Medicaid-eligible women who are the victims of rape or incest. Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1994, Pub.L. No. 103–112, 107 Stat. 1082 (1993).

The United States Court of Appeals for the Tenth Circuit recently has held that Colorado's voluntary participation in the federal Medicaid program requires that state to "do so on the terms established by Congress." *Hern v. Beye,* 57 F.3d 906, 913 (10th Cir.1995), *cert. denied, Weil v. Hern,* No. 95–701, —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 494 (U.S. Dec. 4, 1995). Therefore, Colorado's abortion funding restrictions under its medical assistance program can no longer limit funding to situations where the mother's life is in danger, but must provide funds for victims of rape or incest as well.

chapter 256B. The MA program is designed to assist persons whose income and resources are insufficient to meet the costs of necessary medical care. Minn.Stat. § 256B.01 (1994). Minnesota also operates the General Assistance Medical Care program ("GAMC"), which provides medical care to those who do not qualify for MA but who are unable to pay for necessary care. Minn.Stat. §§ 256D.01, subd. 1a, 256D.02, subd. 4a, 256D.03, subd. 3 (1992); Minn.R. 9505.1030 (1993). Further, under the County Relief of Poor Act, counties may spend their own funds to provide assistance beyond that furnished by the state. Minn.Stat. §§ 261.001–.28 (1992).

Minnesota's development of abortion funding restrictions paralleled the federal development. Eleven days after the U.S. Supreme Court's decision in *Roe v. Wade*, establishing a right of privacy under the U.S. Constitution encompassing a woman's decision to terminate her pregnancy, 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973), this court held that Minnesota's statute criminalizing abortion was unconstitutional. *See State v. Hodgson*, 295 Minn. 294, 204 N.W.2d 199 (1973); *State v. Hultgren*, 295 Minn. 299, 204 N.W.2d 197 (1973). Within a month of these decisions, the Minnesota Commissioner of Public Welfare issued a policy bulletin announcing that MA would reimburse for the cost of abortions, whether therapeutic or not, if performed by a licensed provider. *See McKee v. Likins*, 261 N.W.2d 566, 575 (Minn.1977). This court later invalidated the bulletin as a violation of the rulemaking provisions of the Administrative Procedure Act. *Id.* at 577–78. *See also Mower County Welfare Bd. v. State Dep't of Pub. Welfare*, 261 N.W.2d 578 (Minn.1977). Subsequently, in 1978, the Minnesota legislature enacted section 256B.011 declaring:

> Between normal childbirth and abortion it is the policy of the state of Minnesota that normal childbirth is to be given preference, encouragement and support by law and by state action, it being in the best interests of the well being and common good of Minnesota citizens.

1978 Minn. Laws ch. 508, § 1 (now Minn. Stat. § 256B.011). At the same time, the legislature enacted several provisions restricting MA/GAMC coverage for abortions. *See* 1978 Minn. Laws ch. 508, §§ 1–6. These provisions represent the origins of the statutory scheme now challenged by the plaintiffs and have remained largely unchanged since first enacted. *See* Minn.Stat. §§ 256B.011, 256B.02, 256B.0625, subd. 16, 256B.40, 261.28, and 393.07, subd. 11 (1994).

In general terms, the challenged provisions limit the availability of public funds for abortion services. Under Minnesota Statutes section 256B.057, subd. 1 (1994), pregnant women are eligible for MA "if countable family income is equal to or less than 275 percent of the federal poverty guideline for the same family size." No asset limitation applies to pregnant women. MA covers a wide range of pregnancy-related services including family planning services, history and physical exams, pregnancy tests, blood tests, ultrasound tests, pap smears and laboratory exams to detect fetal abnormalities. Minn.R. 9505.0280, subp. 1, 9505.0235, subp. 1 (1993). MA also covers medically-necessary prenatal care services including ongoing monitoring, nutrition counseling and education. Minn.R. 9505.0353, subp. 1 (1993). The challenged provisions impose limitations, however, on when MA/GAMC funds can be used to pay for abortions. Under Minnesota Statutes section 256B.0625, subd. 16, MA funds can be used only if one of the following conditions is met:

> (a) The abortion is a medical necessity. "Medical necessity" means (1) the signed written statement of *two physicians* indicating the abortion is medically necessary *to prevent the death of the mother*, and (2) the patient has given her consent to the abortion in writing unless the patient is physically or legally incapable of providing informed consent to the procedure, in which case consent will be given as otherwise provided by law;

> (b) The pregnancy is the result of criminal sexual conduct as defined in section 609.342, clauses (c), (d), (e)(i), and (f), and the *incident is reported within 48 hours after the incident occurs to a valid law enforcement agency for investigation*, unless the victim is physically unable to re-

port the criminal sexual conduct, in which case the report shall be made within 48 hours after the victim becomes physically able to report the criminal sexual conduct; or

(c) The pregnancy is the result of incest, *but only if the incident and relative are reported to a valid law enforcement agency for investigation prior to the abortion.* (1994) (emphasis added).[9] The same conditions apply to the GAMC program. Minn. Stat. § 256D.03, subd. 4(h) (1994). Except in these limited circumstances, payment for abortion services with public funds is expressly prohibited. Minn.Stat. § 256B.40 (1994); *see also* Minn.R. 9505.0220(Q); Minn.R. 9505.0235, subp. 2 (1993). The laws also prohibit the use of public funds under county poor relief programs or by social service agencies to pay for abortions that are not eligible for MA payment. Minn.Stat. § 261.28; § 256B.40; § 393.07, subd. 11 (1994).

## B. Facts Presented to the Trial Court

Prior to the trial court's ruling on cross-motions for summary judgment, the parties submitted affidavits and other discovery to the court detailing the following information.

### 1. Statistics

In fiscal year 1991–92, 125,941 women between the ages of 15 and 44 years received MA in Minnesota. Although the number of women receiving GAMC in any particular fiscal year is unknown, on April 1, 1993, 22,291 women were receiving GAMC. 16,178 abortions were performed in Minnesota in 1991, and it was estimated that a similar number would be performed in 1993. The number of times abortion procedures were reimbursed by MA in 1977, prior to the enactment of the challenged provisions, was 1,942. By comparison, in 1993, MA reimbursed for abortion procedures in only two cases.

### 2. Categories of Women Particularly Affected by the Funding Ban

Plaintiffs submitted affidavits highlighting categories of women particularly affected by the MA/GAMC funding ban on abortions.

#### a. When abortion is sought for health reasons

MA/GAMC will cover an abortion when two physicians certify that the abortion is necessary to prevent the death of the moth-

---

**9.** The criminal sexual conduct provisions referenced in (b) state:

> A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the first degree if any of the following circumstances exists:
> * * *
> (c) circumstances existing at the time of the act cause the complainant to have a reasonable fear of imminent great bodily harm to the complainant or another;
> (d) the actor is armed with a dangerous weapon or any article used or fashioned in a manner to lead the complainant to reasonably believe it to be a dangerous weapon and uses or threatens to use the weapon or article to cause the complainant to submit;
> (e) the actor causes personal injury to the complainant, and either of the following circumstances exist:
> (i) the actor uses force or coercion to accomplish sexual penetration; or
> * * *
> (f) the actor is aided or abetted by one or more accomplices within the meaning of section 609.05, and either of the following circumstances exists:
> (i) an accomplice uses force or coercion to cause the complainant to submit; or

> (ii) an accomplice is armed with a dangerous weapon or article used or fashioned in a manner to lead the complainant reasonably to believe it to be a dangerous weapon and uses or threatens to use the weapon or article to cause the complainant to submit * * *.

Minn.Stat. § 609.342, subd. 1 (1992). Although the rape exception under section 256B.0625, subdivision 16 applies to criminal sexual conduct as defined in section 609.342, clauses (c), (d), (e)(i) and (f), the corresponding Minnesota Rule 9505.0235, subpart 2 states that the provision applies to criminal sexual conduct under section 609.342, paragraphs (c) to (f). The additional section cited by the Rule but not included in the statute is section 609.342, paragraph (e)(ii): sexual penetration when "the actor knows or has reason to know that the complainant is mentally impaired, mentally incapacitated, or physically helpless."

Further, the criminal incest statute provides:

> Whoever has sexual intercourse with another nearer of kin to the actor than first cousin, computed by rules of the civil law, whether of the half or the whole blood, with knowledge of the relationship, is guilty of incest and may be sentenced to imprisonment for not more than ten years.

Minn.Stat. § 609.365 (1994).

er. Minn.Stat. § 256B.0625, subd. 16 (1994). Plaintiffs suggest, however, that for MA/GAMC-eligible women who typically suffer from pre-existing health conditions such as stress or malnutrition, abortion may be necessary to preserve the health of the mother even though it is not clear to the physician that the mother would die without the abortion. Plaintiffs further cite several medical conditions aggravated or caused by pregnancy, including premature ruptured membrane, preeclampsia, hypertension and poorly controlled diabetes, as examples of conditions that might require an immediate abortion, even though they would fall outside the statutory exception for an abortion that is "necessary to prevent the woman's death." If an abortion is not performed in these situations, the woman is exposed to increased health risks such as shock, the need for a blood transfusion, infection, pain and discomfort.

Further, some woman have pre-existing medical conditions that are aggravated by or untreatable during the pregnancy. Examples of conditions that may be aggravated by pregnancy include congenital heart disease, serum hepatitis, rheumatoid arthritis, ovarian cysts, toxemia, iron deficiency, hypertension, and diabetes. Diseases such as cervical cancer that require radiation or chemotherapy treatment are untreatable during pregnancy, as are other conditions requiring medication that may affect the development of the fetus. Abortion may also be sought in cases in which pregnancy aggravates a pre-existing mental illness or psychiatric disability. In such cases, pregnancy increases the risk of breakdown, particularly when the woman must cease taking psychotropic medications due to the pregnancy.

*b. When abortion is sought for rape or incest outside the statutory limits*

Under the challenged provisions, MA/GAMC reimburses for abortion when the pregnancy results from rape that was reported to law enforcement authorities within 48 hours of the incident or within 48 hours after the victim becomes physically able to report the incident. Minn.Stat. § 256B.0625, subd. 16 (1994). Further, MA/GAMC reimburses when the pregnancy results from incest that was reported to law enforcement authorities prior to undergoing an abortion. *Id.* In light of these limitations, plaintiffs submitted affidavits indicating that a significant number of women seeking abortions due to rape or incest do not meet these requirements.

First, the State concedes that both rape and incest are under-reported in Minnesota and that many women who are victims of rape and incest do not report the incident to law enforcement authorities within the statutory reporting requirements. The State agrees, in cases of rape, women are often too traumatized or too ashamed to report the rape within the 48-hour statutory period. Although such women may reveal the incident to a friend or victim advocate, they are not likely to report to law enforcement officials as required by the provision. Pro-Choice Resources submitted information to the trial court indicating that it typically assists four to five women per quarter who are pregnant as a result of rape and who did not report the incident to law enforcement authorities within the statutory period. In the third quarter of 1993, PCR assisted eight women in this situation. Similarly, not all incest victims are psychologically able or willing to report an abusing relative to law enforcement officials within the nine-month period of pregnancy. One study cited by plaintiffs found that only 2% of all child incest cases were ever reported to police. PCR indicated it typically assists one woman per quarter who is pregnant as a result of incest and whose abortion is not covered by MA because she did not report the incident to law enforcement.

Second, a number of pregnancies resulting from rape or incest do not fit within the specific categories of offenses designated in the statute. For example, because the statutory exception for rape is limited to those involving actual or threat of physical violence, it excludes "statutory rape" based on the age of the victim and the perpetrator, and it excludes rape in which the perpetrator is in a position of authority over the victim and uses this authority to cause the victim to submit. *See* Minn.Stat. § 609.342(a)–(b) (1992). MA/GAMC also excludes rape when the victim is mentally impaired, mentally incapacitated, or physically helpless. *See*

Minn.Stat. § 609.342(e)(ii). Moreover, the exception for incest victims is limited to blood relatives, and pregnancy resulting from incest by a steprelative is not covered. Minn.Stat. § 609.365 (1994). One study cited by plaintiffs, however, indicates that steprelatives are proportionally more likely to sexually abuse their female relatives than blood relatives.

### 3. Implications of the Funding Restrictions on Women's Health

The State concedes that one study has found that Medicaid-eligible women who are denied funding delay abortion while they seek alternative funds. Plaintiffs' affidavits suggest that such women may delay for several weeks to obtain funding from other sources. Women commonly cancel and reschedule appointments for the procedure a number of times while they seek funding. Plaintiffs' affidavits further demonstrate that delay in the performance of an abortion increases the health risks women face in connection with the procedure. Therefore, the restrictions imposed on poor women who seek therapeutic abortions may actually subvert the purpose of the MA/GAMC program, which is to alleviate the hardships faced by those who cannot afford medical treatment. The mortality risk of abortion increases with gestational age, and one study suggests that the mortality risk of abortion increases 50% with each week after the eighth week of pregnancy. See Cates and Grimes, *Morbidity and Mortality of Abortion in the United States,* in *Abortion and Sterilization: Medical and Social Aspects* 158, 172 (J. Hodgson ed., 1981). The State agrees that, if abortions were reimbursable under MA/GAMC, some women would receive earlier abortions. The State also admits that delay in the performance of abortion may cause some in-

crease in the health risk to the pregnant woman and can impose pain, discomfort, or increased risks for women with medical complications. However, the State disputes the degree to which the health risks are increased due to delay.

### II.

The first issue to be decided by this court is whether the challenged statutory provisions impermissibly infringe on a woman's right of privacy in violation of Article I, Sections 2, 7 and 10 of the Minnesota Constitution.

The right of privacy was first recognized at the federal level. In *Griswold v. Connecticut,* the U.S. Supreme Court recognized a "zone of privacy created by several fundamental constitutional guarantees" protected by the federal constitution. 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). Encompassed by this right of privacy under the constitution is every woman's fundamental right to decide to terminate her pregnancy free from unwarranted government intrusion. *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). This right protects against unduly burdensome interference with procreative decision-making, and only a compelling interest can justify state regulation impinging upon that right. *Maher v. Roe,* 432 U.S. 464, 473–74, 97 S.Ct. 2376, 2382–83, 53 L.Ed.2d 484 (1977); *Roe v. Wade,* 410 U.S. at 155–56, 93 S.Ct. at 728.

In 1987, this court recognized a similar right of privacy guaranteed under and protected by the Minnesota Bill of Rights.[10] *State v. Gray,* 413 N.W.2d 107, 111 (Minn. 1987); *see* M.S.A., Const. Art. 1, §§ 1–17. This court has never directly addressed, however, whether the right of privacy under the

---

**10.** Specifically, in *Jarvis v. Levine,* we indicated that the right of privacy under the Minnesota Constitution is rooted in Article I, Sections 1, 2 and 10. 418 N.W.2d 139 (Minn.1988). Article I, Section 1 provides: "Government is instituted for the security, benefit and protection of the people * * *." Article I, Section 2 provides: "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers. * * *."

Article I, Section 10 provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated * * *."

We also find Article I, Section 7 applicable: "No person shall be held to answer for a criminal offense without due process of law * * * nor be deprived of life, liberty or property without due process of law."

Minnesota Constitution encompasses a woman's decision to terminate her pregnancy.

■ In evaluating this issue, we first note that the right of privacy protects only fundamental rights, and therefore "a law must impermissibly infringe upon a fundamental right before it will be declared unconstitutional as violative of the right of privacy." *Gray*, 413 N.W.2d at 111. Fundamental rights are those "which have their origin in the express terms of the Constitution or which are necessarily to be implied from those terms." *Id.* (citing Black's Law Dictionary 607 (Rev. 5th ed. 1979)).

■ In the present case, plaintiffs allege that the fundamental right implicated in this case is the right of a pregnant woman to decide whether to terminate her pregnancy. The State has conceded this point and has adopted the view that "the state constitution protects a woman's right to choose to have an abortion." We agree.

In *Jarvis v. Levine*, we held that the "right [of privacy] begins with protecting the integrity of one's own body and includes the right not to have it altered or invaded without consent." 418 N.W.2d 139, 148 (Minn.1988). We therefore found that the right to be free from intrusive medical treatment is a fundamental right encompassed by the right of privacy under the Minnesota Constitution. *Id.* at 150. In making that decision, we acknowledged that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id.* at 149 (quoting *Minnesota Bd. of Health v. City of Brainerd*, 308 Minn. 24, 241 N.W.2d 624 (1976), *appeal dismissed*, 429 U.S. 803, 97 S.Ct. 35, 50 L.Ed.2d 63 (1976)).

We find this characterization equally persuasive in the context of the present case. The right of procreation without state interference has long been recognized as "one of the basic civil rights of man * * * fundamental to the very existence and survival of the race." *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). We can think of few decisions more intimate, personal, and profound than a woman's decision between childbirth and abortion. Indeed, this decision is of such great import that it governs whether the woman will undergo extreme physical and psychological changes and whether she will create lifelong attachments and responsibilities. We therefore conclude that the right of privacy under the Minnesota Constitution encompasses a woman's right to decide to terminate her pregnancy.

## III.

■ Having made this determination, we next consider whether the challenged statutes impermissibly infringe on this right of privacy.

As noted previously, the U.S. Supreme Court has evaluated this issue in light of the federal constitution. In the companion cases of *Beal v. Doe* and *Maher v. Roe*, the Court held that the government may refuse to pay for nontherapeutic abortions without conflicting with Title XIX and without impinging on the fundamental right of privacy recognized in *Roe v. Wade*. *Beal v. Doe*, 432 U.S. 438, 447, 97 S.Ct. 2366, 2372, 53 L.Ed.2d 464 (1977); *Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1977). The Court noted that even though the state's interest in encouraging childbirth is not compelling until after viability, it is nevertheless "a significant state interest existing throughout the course of the woman's pregnancy." *Beal*, 432 U.S. at 446, 97 S.Ct. at 2371. The state can therefore make "a value judgment favoring childbirth over abortion, and * * * implement that judgment by the allocation of public funds." *Maher*, 432 U.S. at 474, 97 S.Ct. at 2382.

Two years later, in *Harris v. McRae*, the Supreme Court reviewed the Hyde Amendment restricting federal funding of abortion to determine whether it violated any substantive rights secured by the Constitution. 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). In its analysis of whether the funding ban constituted an impermissible infringement, the Court noted:

The financial constraints that restrict an indigent woman's ability to enjoy the full

range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortion, but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. *Id.* at 316–17, 100 S.Ct. at 2688. The Court thus viewed the woman's indigency and not the statute as creating the infringement on the woman's decision to terminate her pregnancy, and it held that the government may refuse to pay for abortions without impinging on the constitutionally protected freedom of choice recognized in *Roe v. Wade.* *Id.* at 317, 100 S.Ct. at 2688.

In the case before us, the State and the dissent assert that this court should adopt the *McRae* Court's distinction between government action that creates an obstacle to abortion and government action that simply fails to remove a preexisting barrier, and should find no infringement. Inherent in this argument is the assertion of the State and the dissent that the Minnesota Constitution does not require the state to fund the exercise of every fundamental right. The State relies upon the *McRae* Court's statement that "[a]lthough the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." 448 U.S. at 317–18, 100 S.Ct. at 2688. In support of this argument, the dissent cites several examples of how the state does not fund all choices, even when a particular choice is constitutionally protected.[11] These analogies, however, misconstrue plaintiffs' claim. Rather than asserting that the Minnesota Constitution requires the state to fund abortions under MA/GAMC, plaintiffs instead argue that the state may not fund childbirth-related health services without funding abortion-related health services because this interferes with a woman's decision-making process. The relevant inquiry, then, is whether, having elected to participate in a medical assistance program, the state may selectively exclude from such benefits otherwise eligible persons solely because they make constitutionally protected health care decisions with which the state disagrees.

Plaintiffs urge us to construe the Minnesota Constitution more broadly than the *McRae* Court construed the U.S. Constitution and to find that the "ban on medical assistance funding for abortion services 'interferes' with a woman's choice to have an abortion by adding state created financial considerations to the woman's decision making process." Other state courts have addressed this issue, and a substantial majority of these courts have departed from *McRae.*[12]

**11.** One such example is the assertion that the denial of public funds for abortions is analogous to the denial of public funds for religious education, comparing the constitutional right of freedom of conscience to the constitutional right of privacy. Under the Minnesota Constitution, this analogy fails on its face. On the one hand, Article XIII, Section 1 of the Minnesota Constitution mandates funding of public education. On the other, Article XIII, Section 2 provides that "[i]n no case shall any public money or property be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught." In contrast, there are no constitutional provisions that either mandate or prohibit funding of medical costs. The dissent's analogy fails because in concluding that just as it is constitutional for the legislature to fund public education but not religious education pursuant to the Minnesota Constitution, it is also constitutional for the legislature to choose to fund childbirth-related medical costs but not abortion-related medical costs pursuant to its legislative authority, the dissent equates the government's constitutional power with the legislature's authority to enact statutes. In fact, the legislature is subject to constitutional limitations which prohibit it from impermissibly burdening fundamental rights. *See Essling v. Markman,* 335 N.W.2d 237, 239 (Minn.1983).

**12.** *See Right to Choose v. Byrne,* 91 N.J. 287, 450 A.2d 925 (1982); *Committee to Defend Reprod. Rights v. Myers,* 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779 (1981); *Moe v. Secretary of Admin. and Fin.,* 382 Mass. 629, 417 N.E.2d 387 (1981); *Doe v. Maher,* 40 Conn.Supp. 394, 515 A.2d 134 (1986); *Planned Parenthood Ass'n, Inc. v. Department of Human Resources of the State of*

In evaluating the opposing arguments, we find the U.S. Supreme Court's decision in *McRae* unpersuasive. As Justice Brennan noted in his dissent to *McRae*, "[the Court has] heretofore never hesitated to invalidate any scheme granting or withholding financial benefits that incidentally or intentionally burdens one manner of exercising a constitutionally protected choice." 448 U.S. at 334, 100 S.Ct. at 2704 (Brennan, J., dissenting). For example, in *Sherbert v. Verner*, the Court reviewed a South Carolina statute that required recipients of unemployment insurance to accept suitable employment when offered, even if the refusal was grounded in religious convictions. 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The *Sherbert* Court held that the state could not terminate the benefits of a Seventh–Day Adventist who refused a job that would require her to work on Saturdays. The Court reasoned:

> It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege * * *. [T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.

*Id.* at 404–406, 83 S.Ct. at 1794–1795. In light of this precedent, we are unpersuaded by the *McRae* majority in that it failed to recognize that the infringement created by a statutory funding ban on abortion is indistinguishable from the infringement the Court found in earlier cases.

Instead, we find exceptionally persuasive Justice Brennan's dissent in *McRae:*

> A poor woman in the early stages of pregnancy confronts two alternatives: she may elect either to carry the fetus to term or to have an abortion. In the abstract, of course, this choice is hers alone, and the Court rightly observes that the Hyde Amendment "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy." * * * But the reality of the situation is that the Hyde Amendment has effectively removed this choice from the indigent woman's hands. By funding all of the expenses associated with childbirth and none of the expenses incurred in terminating pregnancy, the Government literally makes an offer that the indigent woman cannot afford to refuse. It matters not that in this instance the Government has used the carrot rather than the stick. What is critical is the realization that as a practical matter, many poverty-stricken women will choose to carry their pregnancy to term simply because the Government provides funds for the associated medical services, even though these same women would have chosen to have an abortion if the Government had also paid for that option, or indeed if the Government had stayed out of the picture altogether and had defrayed the costs of neither procedure.
>
> The fundamental flaw in the Court's due process analysis, then, is its failure to acknowledge that the discriminatory distribution of the benefits of governmental largesse can discourage the exercise of fundamental liberties just as effectively as can an outright denial of those rights through criminal and regulatory sanctions. Implicit in the Court's reasoning is the notion that as long as the Government is not obligated to provide its citizens with certain benefits or privileges, it may condition the grant of such benefits on the recipient's relinquishment of his constitutional rights.

*McRae*, 448 U.S. at 333–34, 100 S.Ct. at 2704 (Brennan, J., dissenting).

█ Accordingly, to the extent that *McRae* stands for the proposition that a leg-

Or., 63 Or.App. 41, 663 P.2d 1247 (1983), *aff'd on other grounds*, 297 Or. 562, 687 P.2d 785 (1984); *Women's Health Ctr. of W. Va., Inc. v. Panepinto*, 191 W.Va. 436, 446 S.E.2d 658 (1993); *Doe v. Wright*, No. 91–CH–1958 (Ill.Cir. Ct. Dec. 2, 1994); *New Mexico Right to Choose v. Danfelser*, No. SF–95–867(C) (N.M.Dist.Ct. filed July 3, 1995); *Jeannette R. v. Ellery*, No. BDV–94–811 (Mont.Dist.Ct. May 22, 1995). In contrast, three state courts have found no state constitutional violation for state funding of childbirth-related medical costs but not abortion-related medical costs. *See Hope v. Perales*, 83 N.Y.2d 563, 611 N.Y.S.2d 811, 634 N.E.2d 183 (1994); *Doe v. Department of Social Serv.*, 439 Mich. 650, 487 N.W.2d 166 (1992); *Fischer v. Department of Pub. Welfare*, 509 Pa. 293, 502 A.2d 114 (1985).

islative funding ban on abortion does not infringe on a woman's right to choose abortion, we depart from *McRae*. This court has long recognized that we may interpret the Minnesota Constitution to offer greater protection of individual rights than the U.S. Supreme Court has afforded under the federal constitution. *Skeen v. State*, 505 N.W.2d 299, 313 (Minn.1993); *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985). In *Fuller*, we stated:

> Indeed, as the highest court of this state, we are 'independently responsible for safeguarding the rights of [our] citizens.' * * * State courts are, and should be, the first line of defense for individual liberties within the federalist system. This, of course, does not mean that we will or should cavalierly construe our constitution more expansively than the United States Supreme Court has construed the federal constitution. Indeed, a decision of the United States Supreme Court interpreting a comparable provision of the federal constitution that, as here, is textually identical to a provision of our constitution, is of inherently persuasive, although not necessarily compelling, force.

374 N.W.2d at 726–27 (footnote omitted). In some cases, we have in fact interpreted the Minnesota Constitution to provide more protection than that accorded under the federal constitution or have applied a more stringent constitutional standard of review.[13] We find that this is one of those limited circumstances in which we will interpret our constitution to provide more protection than that afforded under the federal constitution.

■ We do not do so lightly. It is a significant undertaking for any state court to hold that a state constitution offers broader protection than similar federal provisions, and it is certainly not sufficient "to reject a [U.S.] Supreme Court opinion on the comparable federal clause merely because one pre-

fers the opposite result." Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U.Balt.L.Rev. 379, 392 (1980). Although there are several possible rationales for interpreting our constitution differently from the federal constitution, we are persuaded today particularly by circumstances attendant to this case, but unique to Minnesota, our precedents, and the inadequacy we find in the federal status quo.

Minnesota possesses a long tradition of affording persons on the periphery of society a greater measure of government protection and support than may be available elsewhere. This tradition is evident in legislative actions on behalf of the poor, the ill, the developmentally disabled and other persons largely without influence in society.

This court too, has acted to establish that tradition during other times when the nation was divided on an important issue. Previously, when this nation was split on the question of slavery, this court relied on the Minnesota Constitution to strike legislation denying citizens of secessionist states access to Minnesota courts. These secessionists were politically unpopular in unionist Minnesota. Nonetheless, this court held that government must protect the rights of each of its citizens, regardless of the fact that the larger community may hold them in low esteem. *Davis v. Pierse*, 7 Minn. 1, 6 (1862); *accord Thiede v. Town of Scandia Valley*, 217 Minn. 218, 224–26, 14 N.W.2d 400, 405 (Minn.1944). We believe that this tradition compels us to deviate from the federal course on the question of denying funding to indigent women seeking therapeutic abortions.

We are also persuaded of the correctness of our decision by our prior decisions to expand the protective reach of the Minnesota Constitution beyond that of the U.S. Constitution and by our decision in *Jarvis*. In

---

13. *See, e.g., Ascher v. Commissioner of Pub. Safety*, 519 N.W.2d 183 (Minn.1994) (warrantless searches at sobriety checkpoints); *Matter of Welfare of E.D.J.*, 502 N.W.2d 779 (Minn.1993) (seizure); *Friedman v. Commissioner of Pub. Safety*, 473 N.W.2d 828 (Minn.1991) (right to counsel at the chemical testing stage of a DWI proceeding); *State v. Russell*, 477 N.W.2d 886 (Minn.1991) (adopting stricter equal protection rational basis standard than federal courts); *State v. Hershberger*, 462 N.W.2d 393 (Minn.1990) (religious liberties); *Jarvis v. Levine*, 418 N.W.2d 139 (Minn. 1988) (bodily integrity); *Skeen v. State*, 505 N.W.2d 299 (Minn.1993) (fundamental right of education); *State v. Hamm*, 423 N.W.2d 379 (Minn.1988) (right to 12–member jury) (subsequently overruled by constitutional amendment).

*Jarvis*, we determined that our obligation to independently safeguard the rights of our citizens required us to decide that case exclusively under the Minnesota Constitution and our state's statutes. 418 N.W.2d at 147. In a situation involving such intimate and personal decisions as the present case, we cannot agree with the federal courts. *McRae* has the practical effect of not protecting a woman's fundamental right to choose to have an abortion and allowing funding decisions to accomplish its nullification of that right. As a result, we believe that our decision today chooses the "better law" to protect this privacy right for Minnesota's indigent women. Minnesota has an interest in assuring those within its borders that their disputes will be resolved in accordance with this state's own concepts of justice. *See Milkovich v. Saari,* 295 Minn. 155, 166–67, 203 N.W.2d 408, 415 (1973).

■■■ It is critical to note that the right of privacy under our constitution protects not simply the right to an abortion, but rather it protects the woman's *decision* to abort; any legislation infringing on the decision-making process, then, violates this fundamental right. In the present case, the infringement is the state's offer of money to women for health care services necessary to carry the pregnancy to term, and the state's ban on health care funding for women who choose therapeutic abortions. Faced with these two options, financially independent women might not feel particularly compelled to choose either childbirth or abortion based on the monetary incentive alone. Indigent women, on the other hand, are precisely the ones who would be most affected by an offer of monetary assistance, and it is these women who are targeted by the statutory funding ban.[14] We simply cannot say that an indigent woman's decision whether to terminate her pregnancy is not significantly impacted by the state's offer of comprehensive medical services if the woman carries the pregnancy to term. We conclude, therefore, that these statutes constitute an infringement on the fundamental right of privacy.

Because the challenged provisions infringe on the fundamental right of privacy, we must subject them to strict scrutiny. *Skeen v. State,* 505 N.W.2d 299, 312 (Minn.1993). The State's interest in participating in Medicaid and in providing MA/GAMC is to provide assistance to those whose income and resources are insufficient to meet the costs of necessary medical care. *See* Minn.Stat. §§ 256B.01 and 256D.01 (1994). Within this broader purpose, the legislature has specifically stated its policy in regard to the funding provisions:

> Between normal childbirth and abortion it is the policy of the state of Minnesota that normal childbirth is to be given preference, encouragement and support by law and by state action, it being in the best interests of the well being and common good of Minnesota citizens.

Minn.Stat. § 256B.011 (1994). Based on this policy, the State indicates that its interest is the preservation of potential human life and the encouragement and support of childbirth. However, a woman's right of privacy encompasses her decision whether to choose health care services necessary to *terminate* or to *continue* a pregnancy without interference from the state, "at least until such time as the state's important interest in protecting the potentiality of human life predominates over the right to privacy, which is usually at viability." *State v. Merrill,* 450 N.W.2d 318, 322 (Minn.1990), *cert. denied,* 496 U.S. 931, 110 S.Ct. 2633, 110 L.Ed.2d 653 (1990) (citing *Roe,* 410 U.S. at 163, 93 S.Ct. at 732). Un-

14. In fact, our state's own commitment to health care issues highlights the recognition that without monetary assistance, some people are forced to accept the alternative: foregoing necessary medical care. *See* Minn.Stat. § 62J.015 (MinnesotaCare Act policy statement); Minn.Stat. § 256B.01 (Medical Assistance Act policy statement). These policy statements provide:

> The legislature finds that the staggering growth in health care costs is having a devastating effect on the health and cost of living of Minnesota residents. The legislature further finds that the number of uninsured and underinsured residents is growing each year * * *. Minn.Stat. § 62J.015 (1994).
> Medical assistance for needy persons whose resources are not adequate to meet the cost of such care is hereby declared to be a matter of state concern. To provide such care, a statewide program of medical assistance, with free choice of vendor, is hereby established. Minn.Stat. § 256B.01 (1994).

der *Roe v. Wade,* then, the state's interest in potential life does not become compelling prior to viability. 410 U.S. at 162–65, 93 S.Ct. at 731–33. Because the challenged provisions apply at all stages of pregnancy, including prior to viability, they do not withstand strict scrutiny, and thus must be invalidated.

We emphasize that our decision is limited to the class of plaintiffs certified by the district court and the narrow statutory provisions at issue in this case. Specifically, we hold that the State cannot refuse to provide abortions to MA/GAMC-eligible women when the procedure is necessary for therapeutic reasons. The statutory scheme, as it exists, takes the decision from the hands of such women in a manner that, in light of the protections afforded by our own constitution, we simply cannot condone. Contrary to the dissent's allegations, this court's decision will not permit any woman eligible for medical assistance to obtain an abortion "on demand." Rather, under our interpretation of the Minnesota Constitution's guaranteed right to privacy, the difficult decision whether to obtain a therapeutic abortion will not be made by the government, but will be left to the woman and her doctor.

Affirmed.

STRINGER, J., took no part in the consideration or decision of this case.

COYNE, Justice (dissenting).

I respectfully dissent. As the commissioner of human services cogently remarked in her brief, abortion is not merely a highly volatile issue, it is "one of the most politically divisive legal issues of our time." Since the early 1970s, I have observed that "abortion," though often posited as the subject of discussion, is seldom discussed. Perhaps because the subject plumbs deeply held philosophical and moral beliefs, speakers oftentimes are prone to abandon reasoned discourse for exhortation either "for" or "against" abortion. Because I believe that the majority's decision today will not only assure the continued divisiveness of the issue but will, indeed, escalate the acrimony attendant upon it, I shall attempt to address the constitutional issues in a reasoned and principled manner without the inflammatory rhetoric that so often attends the subject.

The initial judicial exploration of the right of privacy with respect to the decision to terminate a pregnancy by abortion is, of course, found in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There the plaintiff challenged Texas statutes which made it a crime to "procure an abortion" or to attempt one, except for "an abortion procured or attempted by medical advice for the purpose of saving the life of the mother." *Id.* at 117–18 n. 1, 93 S.Ct. at 709 n. 1. After reviewing a line of decisions in which the Court had recognized a right of privacy, which is not explicitly mentioned in the Constitution but whose roots had, at various times, been found in the First Amendment, the Fourth, Fifth or Ninth Amendments, in the penumbras of the Bill of Rights, or in the concept of liberty guaranteed by the Fourteenth Amendment, the Court pointed out that this right of personal privacy has some extension to activities relating to marriage, procreation, contraception, family relationships and to child rearing and education. The Supreme Court set out its holding in these words:

> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State [of Texas] would impose upon the pregnant woman by denying this choice altogether is apparent.

*Roe v. Wade,* 410 U.S. at 153, 93 S.Ct. at 727.

After rejecting the argument "that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses," *id.,* the Court went on to recognize that the State, too, has valid interests which are strong enough to support some regulation in areas protected by the right of privacy:

[A] State may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life. * * * The privacy right involved, therefore, cannot be said to be absolute. * * *

We, therefore, conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation.

*Id.* at 154, 93 S.Ct. at 727.

The right of privacy which the Supreme Court recognized in *Roe v. Wade* was a woman's right to address the question whether or not to terminate her pregnancy unfettered by state law *criminalizing abortion and to free her decision from the possible burden of complicity in a crime.* The decision in *Roe* goes no further. Moreover, the right of privacy of which the Supreme Court speaks in *Roe* is not absolute; the abortion decision, like any other constitutionally protected choice, must be balanced against state interests, which the Supreme Court regarded as important enough to justify some regulation. Although the right of personal privacy is broad enough to include the abortion decision, that right is "subject to some limitations" and "at some point the state interests as to protection of health, medical standards, and pre-natal life, become dominant." *Id.* at 155, 93 S.Ct. at 728.

Misapprehending the *Roe* analysis *and* its context, the majority suggests that it is the identical right which is at issue here and compels the decision reached by the majority. It is not, however, the same right. At least, it seems to me, despite the majority's insistence that there is a single right at issue here, that there is a very significant difference between a right to decide to terminate a pregnancy by abortion without fear of criminal complicity and a right to compel the state to pay for the abortion.

A careful review of *Roe* reveals not only that a pregnant woman's right of privacy is not absolute but also that the Court adopted a posture of neutrality about the morality or immorality of abortion which is the essential point of the decision in *Roe:*

Texas urges that * * * life begins at conception and is present throughout pregnancy, and that, therefore, the State has a compelling interest in protecting that life from and after conception. We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer.

410 U.S. at 159, 93 S.Ct. at 730.

By declining to decide when life begins, the Court acknowledged that the respect to which an unborn life is entitled is a controversial issue which the Constitution reposes in the conscience of each pregnant woman with respect to the unborn or potential life she is carrying.

If, as the Supreme Court held, the right to choose to terminate a pregnancy by abortion arises out of a right of privacy, the government must keep its nose out of the woman's privacy and keep its hands off. But while the government must not interfere with the rights of the woman who chooses abortion, the posture of neutrality adopted in *Roe* requires the government to recognize also that opposition to abortion is based on a conscientious conviction which is deserving of equal respect.

In the present case the majority promptly abandons all vestige of neutrality. First, the majority frankly extols abortion as a positive good and the cure for all the ills from which a pregnant woman could possibly suffer. Cloaking its discourse in the garb of medical necessity and pregnancy by rape and incest, the majority concludes that the right to decide without fear of criminal complicity to have an abortion is the right to require the state to provide abortion at taxpayer expense.

Treating these two discrete "rights" as one, the majority disclaims any necessity to address the plaintiffs' equal protection arguments. Having side-stepped the issue, the majority scoffs at any discussion of the equal protection arguments, but because I do not believe that the right of privacy confers on a

pregnant woman the right to demand that the state pay for whatever option she chooses, it is necessary to address those arguments in this dissent.

Initially, the plaintiffs attack the statute on the ground that any distinction between an abortion necessary to prevent the death of the mother or the abortion of a pregnancy resulting from reported rape or incest (all of which are funded by Medicaid) and an abortion chosen for any other reason (which is not state funded) is arbitrary and irrational. Suffice it to say that the policy expressed at Minn.Stat. § 256B.01 (1994)—

Medical assistance for needy persons whose resources are not adequate to meet the cost of such care is hereby declared to be a matter of state concern. To provide such care, a statewide program of medical assistance, with free choice of vendor, is hereby established.

—does not mean that the state must as a matter of constitutional right fund whatever medical procedures which a needy person might elect to undergo or even all medical procedures designed to benefit the mental or physical health of all needy persons.[1] If such a constitutional right existed, the existing statutory exclusions of certain licensed chemical dependency programs, of most care provided in institutions for mental diseases, of certain organ transplants, or of cosmetic surgery or most fixed dental bridgework would be vulnerable to the same constitutional challenge. Furthermore, except for those persons fortunate enough to be insured pursuant to a policy of medical insurance which affords coverage for organ transplants, most Minnesotans in need of an organ transplant would be "needy persons whose resources are not adequate to meet the cost of such care." That the need for an organ transplant is almost always a matter of life or death goes without saying.

Next, the plaintiffs challenge the statutory provisions on the ground that they discriminate against women on the basis of gender by funding most—though not all—medically necessary reproductive and other health care for men while denying funding for some abortions. Apart from the fact that any procreative choice with respect to medical intervention affecting the male reproductive system must be made prior to engaging in intercourse—a choice equally available to women—the physiological differences between men and women would seem ample justification for statutory differentiation. *See State v. Witt*, 310 Minn. 211, 219, 245 N.W.2d 612, 618 (1976).

Finally, the plaintiffs attack the notification requirements with respect to claims that the pregnancy resulted from either rape or incest. When, however, a government is prepared to fund an abortion with respect to a pregnancy resulting from rape or incest, it is surely entitled to take steps designed to establish that the claimant is a victim of rape or incest and to reduce fabrication of the claim. Certainly, a claim of rape reasonably promptly made is more likely to be true than a claim first voiced after the decision to abort has been made. That such claims are sometimes fabricated has recently been confirmed by media reports that Ms. Roe of *Roe v. Wade* fame has confessed that her allegations that her pregnancy was the result of gang rape were false.

The statute only requires that incest be reported prior to the performance of the abortion. Although the reporting requirement seems more likely intended to establish eligibility for funding, it seems possible that it is also intended to enable the state to extract reimbursement for pregnancy-related expenses from a financially responsible father. That the woman is indigent does not necessarily mean that the relative who fathered the child is also indigent.

The plaintiffs also declare that there is no rational basis for distinguishing between forcible rape and statutory rape or between incest by blood relatives and "incest by steprelatives." There are, it seems to me, obvious distinctions among these types of conduct, which may have influenced the de-

---

1. It is interesting to note that Medicaid affords needy persons a "free choice of vendor," an option that is denied many persons whose medical insurance is purchased by their employer as partial compensation for the employees' labor or is purchased directly by the insured. *See* Minn. Stat. § 256B.01 (1994).

cision to withhold the funding of abortions in cases of pregnancies resulting from what is often called statutory rape or from what the plaintiffs call "incest by steprelatives." Society no doubt has good reason to consider sexual intercourse between steprelatives unacceptable, but it is not because the conduct is incestuous. Since ancient times sexual intercourse between persons within a specified degree of kinship—that is, persons descended from a common ancestor and, therefore, closely related by blood—has been forbidden, and it is that conduct which is today defined as incest. *See* Minn.Stat. § 609.365 (1994). Stepparents are, however, not related by blood to their stepchildren. Neither are stepsiblings related by blood. Hence, sexual intercourse between steprelatives is not incestuous although it may generally be abusive and often amount to rape.

Because the reporting requirement with respect to incest seems to be nothing more than a suitable method of providing evidence of eligibility for an MA funded abortion, there can be no serious question that it passes constitutional muster no matter how it is scrutinized.

The reporting requirement and definition of rape for purposes of establishing eligibility for MA funding pursuant to Minn.Stat. § 256B.0625 pose a rather different question. Despite my opinion that there is a rational basis for the statutory limitations on funding for abortion in cases of pregnancy resulting from rape and my reluctance to second-guess the legislature's judgment, I am uneasy about the limitation of state funding with respect to some pregnancies resulting from conduct proscribed as criminal sexual conduct by Minn.Stat. ch. 609 and by a reporting requirement unrelated to the criminality of the conduct.

The majority, as well as the plaintiffs, conveniently ignore the fact that when the Minnesota Legislature enacted the provisions which declare that medical assistance covers abortion services if one of three conditions is met, the statute was obviously intended to track the Hyde Amendment as it was then in effect. It seems to me apparent that the Minnesota statute was intended to make available to the state whatever funds Congress reserved for Medicaid. Nevertheless, in view of the United States Supreme Court's recent rejection of Colorado's appeal from a decision of the United States Court of Appeals for the Tenth Circuit holding that participation in the federal Medicaid program required Colorado to pay for abortions sought by financially eligible women whose pregnancy resulted from rape or incest, *Hern v. Beye,* 57 F.3d 906 (10th Cir.1995), *cert. denied, Weil v. Hern,* —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 494 (1995), the legislature may well consider it appropriate to assure Minnesota's continued eligibility for federal Medicaid funds by conforming Minn. Stat. § 256.0625, subd. 16 (1994), to the terms of the 1994 Hyde Amendment contained in Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1994, Pub.L. No. 103–112, 107 Stat. 1082 (1993).

Declaring the statutory limitations on abortion funding to be arbitrary and irrational, the plaintiffs urge this court to arrogate unto itself the political function accorded the legislature by Articles III and IV of the Minnesota Constitution. Acceding to the plaintiffs demands, the majority spurns this court's own advice to the legislature that this important political issue—the funding of abortions—should "be decided by the legislature where everyone can have his say." *McKee v. Likins,* 261 N.W.2d 566, 578 (Minn. 1977). Similarly, on at least three occasions the United States Supreme Court has stated in this same context that it is not for the Supreme Court or any other to strike down statutes "because they may be unwise, improvident, or out of harmony with a particular school of thought." *Harris v. McRae,* 448 U.S. 297, 326, 100 S.Ct. 2671, 2693, 65 L.Ed.2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 479, 97 S.Ct. 2376, 2385, 53 L.Ed.2d 484 (1977) (both quoting *Williamson v. Lee Optical,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955)).

> [Rather], when an issue involves policy choices so sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature.

*Maher,* 432 U.S. at 479, 97 S.Ct. at 2385. *See also Harris v. McRae,* 448 U.S. at 326, 100 S.Ct. at 2693, and *Beal v. Doe,* 432 U.S. 438, 447–48 n. 15, 97 S.Ct. 2366, 2372 n. 15, 53 L.Ed.2d 464 (1977).

At bottom the majority's quarrel is with a political reality: selective funding. Although the magnitude of the national debt may be thought to suggest otherwise, the government cannot fund everything—a proposition with which I presume every member of this court as well as every citizen of this state would agree. Government must be selective. When, however, selective funding has some influence on the exercise of constitutional rights, flamboyant oratory sometimes influences the politics of legislative selection with respect to spending decisions. But until today constitutional rights have been regarded as limitations on government's power to interfere with private rights, not entitlements to governmental financial aid.[2] For example, the freedom to engage in interstate travel and to choose in what state one wishes to reside is recognized as a fundamental constitutional right, but even when a homeless Minnesotan whose frostbitten fingers and toes, ears and nose prompt a desire to travel to a warmer clime, to date it has not been suggested that the availability of Minnesota's general assistance while the State declines to fund the purchase of a bus, train, or airplane ticket or to fill the gasoline tank of the frozen indigent's automobile has impermissibly "coerced" the choice to remain in Minnesota. The right of free speech does not compel the government to purchase a newspaper or publishing house for any citizen who wishes to be a publisher. Nor does a funding obligation arise out of the fact that the government itself creates and disseminates certain publications, thereby making private publication of like material economically unsound. At least until today, the publication of printed material by the government has not been considered an impediment to free speech.

The majority asserts that the plaintiffs do not claim that the state must fund all choices but only make an equal protection argument—"that the state may not fund childbirth-related health services without funding abortion-related health services because this interferes with a woman's decision-making process." The majority goes on to state the "relevant inquiry" in these words:

> [W]hether, having elected to participate in a medical assistance program, the state may selectively exclude from such benefits otherwise eligible persons solely because they make constitutionally protected health care decisions with which the state disagrees.

*Ante,* at 28. Although I can think of several less intemperate ways of stating the issue, I shall content myself with responding, "Yes, for the reasons set out below, it *is constitutionally permissible* for the state to fund one alternative and not the other."

The closest analogue to the right of privacy with respect to reproduction and the issue concerning government funding of abortions is, I believe, found in the right to the free exercise of religion expressed in both the United States Constitution and the Minnesota Constitution and the issue concerning government funding of religiously affiliated schools. The constitutional issue is the same, it seems to me, in both cases: when does the government's refusal to fund a constitutionally protected choice impermissibly "burden" the exercise of that right? The majority rather cavalierly disposes of the analogy in a footnote, distinguishing the constitutional right of freedom of conscience from the constitutional right of privacy by reference to the utter absence of any constitutional provision either mandating or prohibiting the funding of medical costs. That melding of two discrete rights demonstrates once again the majority's failure to distinguish between the right of privacy at issue in *Roe* and the right to compel the state to pay for an abortion. The right of privacy recognized in *Roe v. Wade, supra,* that is, the qualified right of a woman to decide whether or not to termi-

---

**2.** Only in the context of criminal prosecutions has there been recognition of entitlement to government aid—access to lawyers and other resources needed for defense—or when the government is already in charge of the person requiring assistance. *E.g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

nate her pregnancy, is not at issue here. That question has been decided by the United States Supreme Court, and we are all bound by that decision. The issue is whether the right to decide whether to terminate a pregnancy includes the right to compel the government to pay for the abortion—the medical procedure necessary to carry out that decision. I see precious little difference from a constitutional perspective between that issue and the question whether the right to decide, as a matter of conscience, to send one's children to a private, religiously affiliated school carries with it the right to demand governmental support of the parochial school. In both cases the *right* of the individual *to decide* is protected by the Constitution, and in both cases the government funds one alternative but not the other. By the Hyde Amendment to the Medicaid Act Congress has prohibited the expenditure of federal monies for most abortions. A series of decisions of the United States Supreme Court—most notably *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)—prohibit the use of federal funds for schools which have a religious affiliation.

As support for its position that a constitutionally protected choice overrides all other constitutional rights, the majority relies on Justice Brennan's remark in his dissent in *Harris v. McRae,* "that [the Court has] heretofore never hesitated to invalidate any scheme of granting or withholding financial benefits that incidentally or intentionally burdens one manner of exercising a constitutionally protected choice." 448 U.S. at 334, 100 S.Ct. at 2704 (Brennan, J., dissenting). Justice Brennan seems to have forgotten, however, his own eloquent concurrence 8 years earlier in the decision in *Lemon,* 403 U.S. at 642, 91 S.Ct. at 2126, prohibiting the expenditure of government funds for private schools affiliated with a religion.[3]

The penultimate paragraph of the *Lemon* opinion concludes with these words:

> The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn.

403 U.S. at 625, 91 S.Ct. at 2117.

Despite its recognition of the enormous contribution of church-related elementary and secondary schools and its acknowledgement that taxpayers "have been spared vast sums" by the maintenance of privately supported church-related schools, the Court drew the line in favor of the establishment clause. *Id.* But in neither *Lemon* nor the later decision in *Committee for Public Education v. Nyquist,* 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948 (1973), where the tension between the establishment clause and the freedom of choice clause of the United States Constitution is expressly recognized, did the Court make any attempt to explain why the establishment clause was accorded precedence. Most earlier cases had treated the free exercise principle as dominant. *E.g., Sherbert v. Verner,* 374 U.S. 398, 409, 83 S.Ct. 1790, 1797, 10 L.Ed.2d 965 (1963).

The right to freely exercise one's religion by choosing to send one's children to a privately funded school that has a religious affiliation was judicially recognized 70 years ago in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). In *Pierce* the Court invalidated an Oregon criminal law requiring a parent or guardian of a child to send the child to a public school. The Court thought it "entirely plain" that this direct prohibition against sending the child to a private school "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children un-

---

**3.** Justice Brennan is, of course, not alone in his inconsistent positions with respect to these two issues. It appears to me that within the last 25 years only Justice Powell has consistently upheld funding restrictions with respect to both private religiously affiliated schools and abortion. *Compare, e.g., Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); and *Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), *with Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); and *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

der their control." *Id.* at 534–35, 45 S.Ct. at 573.

Subsequent to the decision in *Lemon,* in *Norwood v. Harrison,* 413 U.S. 455, 462, 93 S.Ct. 2804, 2809, 37 L.Ed.2d 723 (1973), the Court expressly rejected the argument that *Pierce* stands for the proposition that private or parochial schools have a right "to share with public schools in state largesse."

> It is one thing, [the Court remarked], to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.

*Id.*

To put it another way, a state may not deprive a parent or guardian of the right to choose, in the free exercise of religion, to send his or her child or ward to a religious school by compelling the child's attendance at a public school, but the state may, nevertheless, fund the public schools and at the same time deny any funding of religious schools without violating the equal protection clause of the United States Constitution.

Dismissing the religious school analogy by asserting that there can be no analogy because the Minnesota Constitution expressly mandates funding public education and prohibits funding any school affiliated with a religion while the Constitution says nothing at all about either a right of privacy or the funding of medical costs, the majority totally ignores both constitutional history and the constitutional issue—the free exercise of religion—by the simple expedient of sweeping the express constitutional right to freedom of conscience and the express constitutional prohibition against interference with the rights of conscience under the rug of a footnote. *Ante,* at 28 n.11. But that issue is present in the religious school context in the same way that the right of privacy is present in the abortion context. If an impoverished parent is prevented from sending her children to a school affiliated with a religion by the absence of government funding for that school, there can be no doubt that her rights of conscience have been interfered with in the same way and to the same extent as the privacy right of the impoverished woman who cannot afford an abortion. It may be true that the parent is free to follow the dictates of her conscience in other respects, but although the majority speaks as if abortion were the only procreative choice available to a woman, that is quite obviously not the case. The right of privacy with respect to procreation is considerably broader, and although the choices are clearly narrowed once the woman is pregnant, before she became pregnant there were a number of funded choices available under MA, including contraceptives and education with respect to family planning.

The United States Supreme Court has, of course, decided in both the religious school context and the abortion context that freedom of choice must yield to the government's right to fund one alternative and not the other. Consequently, the plaintiffs assert their claim under the Minnesota Constitution, contending that the statutes create an unconstitutional classification based on wealth by "coercing low-income women to choose childbirth" while "allowing women with financial resources the opportunity to make reproductive choices free of government interference." As we recently observed in *Skeen v. State,* 505 N.W.2d 299, 314 (Minn.1993),[4] "the Minnesota Constitution does not require strict economic equality under the equal protection clause." Whether posed under the United States Constitution or that of Minnesota, the claim must, I believe, fail.

Article I, Section 16 of the Minnesota Constitution provides for freedom of conscience:

> The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to main-

---

4. Inasmuch as the majority twice cites *Skeen v. State,* 505 N.W.2d 299 (Minn.1993), as authority for subjecting the challenged statutes to "strict scrutiny," it is rather interesting to note that because "it cannot be said that there is a 'funda-mental right' to any particular funding scheme," *id.* at 315, in *Skeen* the court applied the rational basis test to determine the constitutionality of legislation affecting the fundamental right to a publicly funded education.

tain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted * * *.

The language of the Minnesota Constitution differs sufficiently from that of the First Amendment of the United States Constitution that this court has held that it affords broader protection with respect to freedom of exercise of religion than does the United States Constitution. *State v. Hershberger,* 462 N.W.2d 393 (Minn.1990). That this court has never had occasion to decide whether this broader protection of the right of conscience requires an answer different from that in *Lemon* and its progeny with respect to the funding of schools with a religious affiliation is hardly surprising in view of the presence of Article XIII, Section 2 of the Minnesota Constitution:

> In no case shall any public money or property be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught.

Inasmuch as this Minnesota constitutional provision comports with the decision in *Lemon, supra,* there can be no question that it does not offend the equal protection clause of the United States Constitution. Furthermore, and more particularly with respect to the plaintiffs' claim here, the constitutional mandate that the state must establish and fund public schools but that it must not provide *any* state funds for the support of religiously affiliated schools makes it abundantly clear that selective government funding of one alternative and not of the other does *not,* pursuant to the Minnesota Constitution, impermissibly interfere with freedom of choice with respect to the two alternatives, only one of which is paid for by the government.

That the drafters of the Minnesota Constitution were cognizant of the necessity for selective funding is apparent when the Minnesota Constitution is placed in historical context. By the middle of the 19th century the basic principles of American education had been formulated and to some extent established. Opposition to free public education came from people of property who objected to their being taxed to support schools to which they would not consider sending their own children. Court decisions adverse to the right of local authorities to impose taxes almost wrecked one state's system in the 1850s. At least one state used its educational fund to subsidize private schools. Most of the impetus for secondary schools came from various religious denominations, and during the 1850s there was spirited public discourse regarding the public funding of education and the perceived evils of the application of public funds for the maintenance of schools affiliated with a religion. Quite obviously the drafters saw no conflict between the prohibition against interference with the rights of conscience and the public funding of public education but not of education in a religiously affiliated school. The inclusion of both Section 1 and Section 2 of Article XIII resolved the difference of opinion, and the freedom to establish with private funds a school affiliated with a religion of one's choice was adequate vindication of freedom of conscience.

Although the freedom of conscience explicitly assured by Article I, Section 16 has resided in the Minnesota Constitution since 1857 without significant change, the right of privacy is not expressly provided anywhere in either the Minnesota Constitution or the United States Constitution. Just as it took almost 200 years for recognition of a right of privacy under the United States Constitution, more than 100 years went by before a right of privacy was found under the state constitution, and then its source was not identified with any specificity; it has only been said to repose somewhere in Article I, Sections 1, 2, 7, and 10. That the rather recently recognized right of privacy is implicit rather than explicit does not, I think, reduce its importance. That the right of privacy is implicit does not relieve it of the necessity to meet the same objective standard with respect to selective funding as those rights which have been expressly assured since 1857. It appears that the drafters of the Minnesota Constitution recognized that if there was to be a constitutional right to an education funded by the public, it was necessary to expressly impose the duty to estab-

lish a system of public schools and authorize its funding by taxation. Having authorized the public funding of an educational system, the legislature could have left it for the courts to determine whether public support of religious schools collided with another constitutional right, such as freedom of religion. But at least one state then supported religious schools, and the decision of the United States Supreme Court in *Lemon* was about a century in the future. Therefore, the careful Minnesota lawyer-drafters thought it necessary to expressly preclude the use of public funds to support religious schools. Since the right of privacy is conspicuously absent from the language of the Minnesota Constitution, there was no reason to provide or prohibit public funding, but the absence of any provision cannot be converted into a constitutional mandate for public funding.

Parents who send their children to a school with a religious affiliation do so as a matter of conscience, knowing full well that they must not only pay as tuition a proportionate part of the cost of operating the religious school but that they must also bear the tax burden of maintaining the public school system which their children do not attend. Accordingly, the parent who exercises the freedom of conscience to choose to send his or her children to a religious school must pay twice, and in that sense is penalized for following his or her conscience. The pregnant woman who chooses abortion, even though she may be required to seek funds elsewhere than from the government, receives through MA all the same prenatal care, including any testing preparatory to the abortion, that is available to a woman who gives birth to her child. Once the abortion is performed, any woman otherwise eligible for MA will receive government funded medical care for complications resulting from the abortion. There can be, I think, no justification for holding that the implicit right of privacy is entitled "strict scrutiny" protection with respect to charges of either unequal protection or "interference" while denying such protection for the explicit right of freedom of conscience. They must be accorded at least equal rank.

The majority relies on a quoted portion of Justice Brennan's dissent in *Harris v. McRae*. That argument has been transposed by Professor Michael W. McConnell, *The Selective Funding Problem: Abortions and Religious Schools*, 104 Harv.L.Rev. 989, 990 (1991), into an argument that it is unconstitutional for the government to refuse to fund religious schools when it funds secular schools:

A poor woman [with school-age children] confronts two alternatives: she may elect either to [send them to secular schools] or to [send them to religious schools]. In the abstract, of course, this choice is hers alone, and the Court rightly observes that [*Lemon* ] "places no governmental obstacle in the path of a woman who chooses to [send her children to religious school]." But the reality of the situation is that [*Lemon* ] has effectively removed this choice from the indigent woman's hands. By funding all of the expenses associated with [secular education] and none of the expenses incurred in [religious education], the Government literally makes an offer that the indigent woman cannot afford to refuse. * * * [M]any poverty-stricken women will choose to [send their children to secular schools] simply because the Government provides funds for [this], even though these same women would have chosen [religious schools] if the Government had also paid for that option, or indeed if the Government had stayed out of the picture altogether and had defrayed the costs of neither * * *.

*Id.* (citing *Harris v. McRae*, 448 U.S. at 333–34, 100 S.Ct. at 2704 (Brennan, J., dissenting)). Justice Brennan would not, I am sure, agree that the government's refusal to fund the religious school unconstitutionally impacts the poor mother's exercise of freedom of religion, but he has never explained why.

Having found the dissenting position in *Harris v. McRae* so persuasive, the majority concludes that the Minnesota statutory provisions for funding childbirth while funding only some abortions infringe upon a woman's right to decide whether to procure an abortion. Because the plaintiffs' pro-choice equal protection argument is surely destined for

failure in the face of the United States Supreme Court's decision in *Harris v. McRae, supra,* and in the face of Article I, Section 16 and Article XIII, Section 2 of the Minnesota Constitution, the majority casts its argument as one of coercion: funding childbirth but only some and not all abortions "coerces" a choice in violation of an absolute right to abortion at government expense. It is mere sophistry to declare as does the majority that the decision to fund childbirth but not abortion is violative of a woman's right of privacy (because it "coerces" a choice) is not grounded on equal protection principles. Whether stated or unstated, the rationale depends on the proposition that funding childbirth but not abortion constitutes an arbitrary classification.

It seems to me that in characterizing the statutory limitations on abortion funding as "coercing" choice, the majority has adopted a position which is not only at odds with Minnesota constitutional law but driven more by enthusiasm for the underlying right of privacy recognized in *Roe v. Wade, supra,* than by a principled understanding of the actual holding of *Roe* and of the relationship between a constitutional right and government funding.[5]

I am not without sympathy for a woman who is pregnant with an unwanted child, and I deplore the inclusion in both the opinion and the dissents in *Harris v. McRae* of value judgments about abortion which are both unnecessary to the arguments and undesirable because they seem to me to depart from the privacy rationale of *Roe.* I also disapprove of the policy statement found at Minn. Stat. § 256B.011 (1994). In order to be eligible for federal funds pursuant to 42 U.S.C. § 1396 (1988 & Supp. IV 1992) each state must have in force a plan for medical assistance approved by the Secretary. Among the myriad mandated provisions of the state plan is the requirement that the plan provide medical assistance to pregnant women qualified pursuant to 42 U.S.C. § 1396d(n) (1988

& Supp. IV 1992). Such medical assistance must include prenatal care and delivery services. Subchapter XIX of Article 42 of the United States Code makes no mention of abortion-related services except, of course, for the often cited Hyde Amendment, which prohibits the use of federal funds for any abortion unless such a procedure is necessary to save the life of the mother or the pregnancy is the result of an act of rape or incest. Inasmuch as Minnesota is required to provide prenatal care and delivery services to pregnant women, there would seem to be no reason for prefacing the state plan with a policy statement which is likely to offend many citizens. Moreover, because the government must often fund the care of an unhealthy or birth-injured child and because it has long been understood that prenatal care and proper medical supervision of childbirth are essential to the health and well-being of a newborn child, there are many reasons for the government to provide funding for such services without any necessity to distinguish between childbirth and abortion. It cannot be denied that the position taken by most people with respect to the termination of a pregnancy by abortion is a matter of conscientious conviction. No matter how wrong-headed one regards the position of the opposition, both positions are deserving of respect.

Nonetheless, as Professor McConnell puts it,

When a matter has been constitutionally declared "private" precisely because of intractable public dissension, there is all the more reason to refrain from public subvention. Taxation is coercion, and to require taxpayers to support religions they do not accept is understood to violate their religious conscience. In the words of the Virginia Act for Establishing Religious Freedom, passed in 1785, "to compel a man to furnish contributions of money for

---

5. The extent of this enthusiasm is reflected in the majority's comparison of the issue raised in *Jarvis v. Levine,* 418 N.W.2d 139, 148 (Minn.1988), with the issue raised here. The statement in *Jarvis* about "the integrity of one's own body" and "the right not to have it altered or invaded

without consent" referred to Jarvis' involuntary treatment by the forcible administration of major tranquilizers and neuroleptic medications, a situation which has no relationship to the question whether government must fund the right of privacy.

the propagation of opinions which he disbelieves, is sinful and tyrannical."

McConnell, *supra,* at 1008.

Even if it is no more "sinful and tyrannical" to tax those who consider abortion to be immoral than it is to tax those who consider war immoral, at the very least, respect for the consciences of those who believe abortion is immoral should count as a legitimate basis for Congress and state legislatures to decide not to devote coerced tax dollars to that use. If, as I believe, the decision whether or not the government should fund abortion is properly a matter for decision by the legislature, the legislature has exercised its authority in what appears to me to be a rational manner. Even though the members of the court may disagree with some or all of the legislature's political decisions with respect to funding abortions, this court should not arrogate unto itself the legislative function. The repeated references in the majority opinion to health care services and therapeutic abortions suggest an expectation that only abortions necessitated by significant health considerations will be state-funded, an implication articulated in the statement of the holding:

> [W]e [*i.e.,* the majority] hold that the State cannot refuse to provide abortions to MA/GAMC eligible women when the procedure is necessary for therapeutic reasons.

*Ante,* at 32. For two reasons, however, I consider any such expectation doomed to failure. First, there is the practical problem posed by the court's inability to set any standard for determining when an abortion is "necessary for therapeutic reasons." If a woman has decided that she does not want the child and that she does not want to carry it to term, it seems to me more than likely that she will find a physician who will agree that the stress of continuing an unwanted pregnancy justifies an abortion.

It is possible, of course, that the legislature could alleviate that problem by adopting some standards, but the legislature can do nothing except propose a constitutional amendment to address the second reason, for the court has created an impediment to any

limitation on state-funded abortions. The majority has based its decision on a constitutional right which it has defined as a "right of privacy under the Minnesota Constitution [which] encompasses a woman's right to decide to terminate her pregnancy." *Ante,* at 27. The majority then affirms an injunction precluding enforcement of statutes and rules [6] on the ground that the statutory provisions which provide for funding childbirth but deny funding for abortion "coerce" a decision in violation of a woman's constitutional right to decide to terminate her pregnancy. Having determined that state-funding of medical services, including delivery of the child, to pregnant women and of some, but not all, abortions "coerces" a pregnant woman's decision whether to give birth or terminate her pregnancy and infringes her constitutional right to decide to terminate her pregnancy, as a matter of constitutional law the court is in no better position than the legislature to deny state-funding because the court does not approve of the reason for the decision to terminate the pregnancy. That the limitations the court imposes are less restrictive than those set by the legislature does not alter the fact that if financial considerations can be said to "coerce" a decision in violation of a constitutional right to decide, *any* restriction of state-funding is "coercive" and, therefore, violative of the fundamental right of privacy.

I would reverse the decision of the district court and direct the entry of judgment in favor of the Commissioner of Human Services.

---

6. The injunction enjoins enforcement of Minnesota Statutes sections 256B.0625, subdivision 16, 256B.40, 393.07, subdivision 11, 261.28, and Minnesota Rules 99505.022(q) and 9505.0235, subpart 2.