Biles, J., concurring:
I concur in the result. I do so because the majority decision provides little guidance for applying strict scrutiny-very rarely used in Kansas-as a meaningful constitutional measure for this legislation. And what guidance it does provide confuses rather than clarifies. For all practical purposes, the majority leaves the trial court to fend for itself. In my view, an issue as troubling as this one requires us to be more instructive. Toward that end, I suggest what our state test should look like using an evidence-based analytical model taken from Whole Woman's Health v. Hellerstedt , 579 U.S. ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016).
But to be clear from the outset, I join the other members of this court who unanimously agree section 1 of the Kansas Constitution Bill of Rights provides all Kansans, including pregnant women, with state-based, judicially enforceable protections against unwarranted government intrusion. Some cast this as a right to abortion, others as a limitation on state police powers, but the bottom line is the same: those challenging government conduct as an unlawful restriction on their protected section 1 interests may do so in a Kansas courtroom. The difference in our approaches is the standard used to measure where our state Constitution draws the line. See majority op. at 492-98 ("traditional" strict scrutiny); op. at 507-08, 513-14 (Biles, J., concurring) (evidence-based analytical model taken from Hellerstedt ); op. at 550-51 (Stegall, J., dissenting) (rational basis "with bite"). This unanimity puts an end to suggestions that section 1 furnishes no basis for judicial relief when government treads on individual rights. See, e.g., Hodes & Nauser, MDs v. Schmidt , 52 Kan. App. 2d 274, 342, 368 P.3d 667 (2016) (Malone, C.J., dissenting); State ex rel. Kline v. Sebelius , No. 05-C-1050, 2006 WL 237113, at *11-12 (Kan. 3d Jud. Dist. Ct. Jan. 24, 2006) ; Appellants' Supp. Brief, at 12; Appellants' Brief, at 23; Amicus Curiae Brief, The Family Research Council, at 2-9.
It is also worth mentioning our court has not gone rogue today. By my count, appellate courts in 17 states have addressed whether their state constitutions independently protect a pregnant woman's decisions regarding her pregnancy from unjustifiable government interference. Of those, 13 have plainly held they do. Valley Hosp. Ass'n v. Mat-Su Coalition , 948 P.2d 963, 969 (Alaska 1997) ; Committee to Defend Reprod. Rights v. Myers , 29 Cal. 3d 252, 262, 274, 172 Cal.Rptr. 866, 625 P.2d 779 (1981) ; In re T.W. , 551 So.2d 1186, 1193 (Fla. 1989) ; Hope Clinic for Women, Ltd. v. Flores , 372 Ill.Dec. 255, 991 N.E.2d 745, 765-67 (2013) ; Planned Parenthood v. Reynolds ex rel. State of Iowa, 915 N.W.2d 206, 237 (Iowa 2018) ; Moe v. Secretary of Administration & Finance , 382 Mass. 629, 649, 417 N.E.2d 387 (1981) ; Women v. Gomez , 542 N.W.2d 17, 31 (Minn. 1995) ; Pro-Choice Mississippi v. Fordice , 716 So.2d 645, 653 (Miss. 1998) ; Armstrong v. State , 296 Mont. 361, 376, 989 P.2d 364 (1999) ; Planned Parenthood v. Farmer , 165 N.J. 609, 613, 762 A.2d 620 (2000) ; Preterm Cleveland v. Voinovich , 89 Ohio App. 3d 684, 691, 627 N.E.2d 570 (1993) ; Planned Parenthood v. Sundquist , 38 S.W.3d 1, 11, 15 (Tenn. 2000), superseded by amendment Tenn. Const. art. I, § 36 (2014) ; State v. Koome , 84 Wash. 2d 901, 904, 530 P.2d 260 (1975).
Three others have implicitly held their state constitutions contain this protection. Reproductive Health Services v. Nixon , 185 S.W.3d 685, 692 (Mo. 2006) (implying a state constitution right to abortion by explicitly holding state constitutional language is not broader than the corresponding federal language); Hope v. Perales , 83 N.Y.2d 563, 575-77, 634 N.E.2d 183, 611 N.Y.S.2d 811 (1994) (stating whether the state constitution protects a woman's "fundamental right of reproductive choice" is "undisputed," and holding the challenged statute constitutional because it did not implicate "her fundamental right of choice"); Wood v. University of Utah Medical Center , 67 P.3d 436, 447-48 (Utah 2002) (implying state constitutional protection *505 when noting the state constitution does not "give any further protection to plaintiffs than does the federal constitution"); cf. Planned Parenthood v. Bd. of Medicine , 865 N.W.2d 252, 262 (Iowa 2015) (listing Nixon and Hope as holding independent state right existed). Only one-an intermediate Michigan appellate court-has held its state constitution does not contain this guarantee. Mahaffey v. Attorney General , 222 Mich. App. 325, 338-39, 564 N.W.2d 104 (1997).
That said, I need to more fully explain my concurrence. I agree with the majority that section 1 substantially restrains the government's ability to encroach into intimate, personal matters deeply affecting a person's "inalienable natural rights," such as a woman's decision whether to bear a child. If it means anything, section 1 must mean that. See Planned Parenthood , 915 N.W.2d at 237 ("Autonomy and dominion over one's body go to the very heart of what it means to be free. At stake in this case is the right to shape, for oneself, without unwarranted governmental intrusion, one's own identity, destiny, and place in the world. Nothing could be more fundamental to the notion of liberty."); Women , 542 N.W.2d at 27 ("We can think of few decisions more intimate, personal, and profound than a woman's decision between childbirth and abortion.").
The Iowa Supreme Court recently articulated the intensely personal and demanding crossroads a pregnant woman can face at this constitutionally protected moment in her life:
"Many reasons have been identified to explain why women choose to have an abortion. Sixty percent of abortion patients already have at least one child and many feel they cannot adequately care for another child. Other women feel they are currently unable to be the type of parent they feel a child deserves. Patients frequently identify financial, physical, psychological, or situational reasons for deciding to terminate an unplanned pregnancy. Some patients are victims of rape or incest, and others are victims of domestic violence. Women also present with health conditions that prevent a safe pregnancy or childbirth. Sometimes, women discover fetal anomalies later in their pregnancies and make the choice to terminate." Planned Parenthood , 915 N.W.2d at 214-15.
This Kansas litigation concerns S.B. 95, which injects the State into a pregnant woman's second trimester decision-making. Again, the Iowa court's description about the personal situations that can arise during this timeframe is equally well-stated:
"There are many reasons women have second trimester or otherwise late-in-window procedures. Most women are not aware of a pregnancy until at least five weeks since their last menstrual period. Some forms of contraception can mask the symptoms of pregnancy, which delays women from discovering a pregnancy by days or weeks. Some patients' life circumstances change drastically between discovery and the decision to terminate. A patient may have lost her job, ended the relationship with her partner, or lost a support system. Significantly, almost no fetal anomalies can be diagnosed until the second trimester when prenatal screening is conducted. Usually, an anatomical ultrasound is not performed until the eighteenth or twentieth week of pregnancy. Thus, some women may not be alerted to a problem until the second trimester, and by the time they have spoken with physicians and made the difficult choice to terminate, they may be very close to, or beyond, the twenty-week cutoff [for an abortion in Iowa]." 915 N.W.2d at 218.
See also The American College of Obstetricians and Gynecologists, Practice Bulletin No. 135: Second Trimester Abortion, 121 Obstetrics & Gynecology 1394, 1394 (2013).
Pregnant women, like the rest of us, have protected liberty interests fully rooted in our Kansas Constitution. No one can reasonably deny that. Yet the record so far indisputably shows S.B. 95 does more than significantly constrain a woman's access to abortion. It is a governmental edict denying pregnant women the safest and most routine medical procedure available for its purpose in the second trimester-a procedure elected by approximately 600 women in Kansas annually. And the justification for this prohibition is that the government professes to prefer less routine, more physically invasive medical options *506 without offering actual evidence at the temporary injunction hearing to support this preference. Those who think there is no role for our state Constitution when government flexes this kind of muscle should be very afraid about what comes next.
We seem to relearn these lessons far too often. For instance, in Buck v. Bell , 274 U.S. 200, 205-06, 47 S.Ct. 584, 71 L.Ed. 1000 (1927), the Court upheld a Virginia law authorizing involuntary sterilization of the intellectually disabled. In doing so, the Court remained silent about whether substantive due process protected those subject to forced government sterilization and justified it as a means to an appropriate end. 274 U.S. at 207, 47 S.Ct. 584 ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind."). Kansas courts shamefully fell in line. See State ex rel. Smith, v. Schaffer , 126 Kan. 607, 270 P. 604 (1928) (upholding constitutionality of R.S. 1923, 76-149 through 76-155, authorizing sterilization of the "insane," epileptic, or "feeble-minded" as justified by "the interest of the higher general welfare"); cf. L. 1965, ch. 477, § 1 (repealing R.S. 1923, 76-149). Fortunately, an appropriate constitutional perspective eventually materialized. See Skinner v. Oklahoma , 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (holding Oklahoma Habitual Criminal Sterilization Act violated equal protection guarantee by applying strict scrutiny since the challenged law implicated a fundamental right; stating, "We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race").
This is why we have a state constitution with a bill of rights instead of unrestrained rule by whatever legislatively represented majority exists in the moment. See Madison, Federalist No. 51, The Structure of the Government Must Furnish the Proper Checks and Balances Between the Different Departments , in Hamilton, Jay, and Madison, The Federalist Papers 382 (The Floating Press ed. 2011) (1787) ("In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."); Planned Parenthood , 915 N.W.2d at 244 ("[T]he state's capacity to legislate pursuant to its own moral scruples is necessarily curbed by the constitution. The state may pick a side, but in doing so, it may not trespass upon the fundamental rights of the people."). And once we accept that there must be constraints on the government's power over its citizens, as we do in this country, courts have a singular role in defining contours to the constitutional protections that ensure statutory or regulatory restrictions on our rights are commensurate with what is at stake. "[T]his court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas." Harris v. Shanahan , 192 Kan. 183, 207, 387 P.2d 771 (1963).
Our court is called upon today to set those contours in a specific context, i.e., limiting the government's ability to control a woman's decisions concerning her pregnancy. This is where I take exception with the majority's unrefined strict scrutiny standard. It amounts to little more than name dropping. Let me explain my concern.
The false dichotomy between the "strict scrutiny" vs. "undue burden" labels
Federalism principles, which underlay our form of government, recognize that states are free to establish their own standards against which they will measure governmental restrictions on judicially enforceable, substantive rights arising from their state constitutions. See Kansas v. Carr , 577 U.S. ----, 136 S.Ct. 633, 648, 193 L.Ed.2d 535 (2016) ("The Federal Constitution guarantees only a minimum slate of protections; States can and do provide individual rights above that constitutional floor."); Oregon v. Hass , 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) ("[A] State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards.").
My colleagues all agree, as do I, that a Kansas standard based on section 1 in the present context cannot be blindly bound to *507 United States Supreme Court jurisprudence on abortion. Majority op. at 469-70, 494-96 op. at 550-51 (Stegall, J., dissenting). This is not an instance in which we simply go lockstep with federal caselaw. See, e.g., State v. Daniel , 291 Kan. 490, 498, 242 P.3d 1186 (2010) ("We interpret § 15 of the Kansas Constitution Bill of Rights to provide the same protection from unlawful government searches and seizures as the Fourth Amendment to the federal Constitution."). As both the majority and dissent point out, section 1 of the Kansas Constitution Bill of Rights differs from any federal counterpart, so the measure for deciding when its protections can be invoked does not necessarily mirror federal caselaw.
But federal jurisprudence can inform how our court should fashion a state constitutional test. And there is more than 45 years of federal caselaw to draw from on this subject, so I would look to the evidence-based analytical framework from Hellerstedt to style our Kansas test. My Hellerstedt -based test sets a considerably high bar that sufficiently protects the substantive personal interests at risk from legislation such as this. At the same time, this Hellerstedt analysis acknowledges important state interests with abortion that must also be conceded, but are not recognized under federal strict scrutiny abortion jurisprudence.
The Hellerstedt model I suggest effectively secures the constitutional protections considered today in a manner commensurate with what is at stake. And for me, the articulation that follows is necessary because it avoids simply tossing around strict scrutiny nomenclature like "compelling state interest" or "narrowly tailored to further that compelling state interest" without giving those concepts contextual substance and then hoping for the best. Majority op. at 466-67, 493-94, 501-02, 502-03. Litigation such as this is factually intensive and often medically based so an abstract, textbook approach is counterproductive. This is where the majority decision leaves the district court in a lurch.
The majority rationalizes that federal "undue burden" jurisprudence "has proven difficult to understand and apply." Op. at 494-95. But so what? We are tasked with developing a state standard against which a Kansas court is to scrutinize S.B. 95, so why not learn from the federal standard and do what needs to be done now to help this litigation conclude? Instead, the majority masks the lack of strict scrutiny caselaw in Kansas by citing a string of cases that only mention strict scrutiny in passing while applying a lesser standard to the facts in controversy. See, e.g., op. at 497-98 (citing State ex rel. Schneider v. Liggett , 223 Kan. 610, 618, 576 P.2d 221 [1978], as support for strict scrutiny when it actually applied rational basis standard). This necessarily raises the question how the district court can predict what might be viewed as "strict scrutiny" without proper direction from this court.
Said more pointedly, there is very little Kansas "tradition" to the constitutional analytical standard the majority characterizes as "traditional." Op. at 495-96. I can find only two strict scrutiny cases by this court applying that standard for state constitutional claims, and neither is particularly helpful in the context presented by this legislation. See State v. Ryce , 303 Kan. 899, 957, 368 P.3d 342 (2016) (because a fundamental right to be free from an unreasonable search was involved, the court employed strict scrutiny in evaluating the constitutionality of a statute criminalizing driver's revoking implied consent for DUI testing); Jurado v. Popejoy Constr. Co ., 253 Kan. 116, Syl. ¶ 5, 853 P.2d 669 (1993) (since a suspect classification-alienage-was implicated, the court used strict scrutiny in assessing the constitutionality of a statute limiting workers compensation death benefits of dependents who were nonresident aliens to the sum of $ 750). Indeed, the majority concedes "there are no Kansas cases applying strict scrutiny to natural rights." Op. at 495. I expect the trial court will have the same problem I am trying to figure out what "strict scrutiny" means for this case since this is only the third time in our court's caselaw that standard is to be applied.
Adding to this confusion, the majority announces: "Of course, before a court considers whether a governmental action survives this [strict scrutiny] test, it must be sure the action actually impairs the right ." (Emphasis *508 added.) Op. at 497-98. But how does this differ from undue burden? See Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion) ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."); see also Hellerstedt , 136 S.Ct. at 2309 (" '[A] statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.' "). Is a government act that "actually impairs the right" something different? Is there not a process of weighing inherent in making that determination? The trial court is going to have to make sense of this nuance, and I wish it luck because I can't tell the difference.
Another trouble spot is reconciling "strict scrutiny" abortion caselaw with the majority's rationale and its instructions on remand. The majority correctly observes the United States Supreme Court applied strict scrutiny to abortion legislation in Roe v. Wade , 410 U.S. 113, 154-55, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (invalidating law forbidding abortion except to save mother's life), and its companion case, Doe v. Bolton , 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (invalidating procedural conditions and limitations on abortion access to Georgia residents). Op. at 493-94. But the Roe Court identified the State's " 'compelling' point" as beginning at a pregnancy's second trimester-and only as to "the State's important and legitimate interest in the health of the mother ." (Emphasis added.) Roe , 410 U.S. at 163, 93 S.Ct. 705. Is the majority signaling a return to Roe ? It's hard to tell.
Under Roe , it was not until fetal viability that the State had any " 'compelling' " interest in potential life. Roe , 410 U.S. at 163, 93 S.Ct. 705 ("State regulation protective of fetal life after viability thus has both logical and biological justifications."). Roe also made clear the State has no " 'compelling' point" in the first trimester, so "the attending physician, in consultation with [the] patient, is free to determine, without regulation by the State, that, in [the doctor's] medical judgment, the patient's pregnancy should be terminated." 410 U.S. at 163, 93 S.Ct. 705. The majority does not explain whether Roe 's trimester framework has any application in Kansas, even though it refers to it and says it is adopting a strict scrutiny standard. Op. at 493-94. More confusingly, the majority implies criticism of Roe 's trimester-based distinctions by directing the district court on remand to "take into account advances in science that have blurred the sharp trimester-based lines used in Roe 's strict scrutiny analysis." Op. at 503. But those distinctions are at the heart of federal strict scrutiny abortion jurisprudence, so what is the district court to do? The answer, it seems, will be for the trial court to make something up.
It also should be understood federal strict scrutiny cases in the abortion context tolerated no government interference into a woman's pregnancy before viability-except for maternal health reasons during the second trimester and unique circumstances relating to pregnant minors. Casey , 505 U.S. at 876, 112 S.Ct. 2791 (plurality opinion) ("Before viability, Roe and subsequent cases treat all governmental attempts to influence a woman's decision on behalf of the potential life within her as unwarranted."); Bellotti v. Baird , 443 U.S. 622, 639-40, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) (considering whether the "special interest of the State in encouraging an unmarried pregnant minor to seek advice of her parents in making the important decision whether or not to bear a child" does not "unduly burden the right to seek an abortion"); cf. Colautti v. Franklin , 439 U.S. 379, 388, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) ("Viability is reached when, in the judgment of the attending physician on the particular facts of the case before [the physician], there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.").
My larger point is this: if Kansas is adopting a pre- Casey stance, then this legal dispute is all but over. S.B. 95 is not claimed by the State to have been enacted to promote maternal health-it is all about fetal protection *509 and tellingly entitled, "the Kansas unborn child protection from dismemberment abortion act." K.S.A. 65-6741. And its legislative history shows patient safety was never brought up as a supporting justification. So what is left for the district court to ferret out through trial if the State's only "compelling interest" in the second trimester can be promoting maternal health? The majority says it will not "guess at what the arguments and evidence might be in order to provide guidance on remand." Op. at 503. But no guesswork is required-it is squarely in this legislation's title and legislative record, so why not talk about it now?
Pre- Casey federal strict scrutiny jurisprudence will also have potentially unsettling ripple effects in other areas of Kansas law touching on abortion access. See, e.g., K.S.A. 65-6709 (requiring informed consent). Compare Casey , 505 U.S. at 882, 112 S.Ct. 2791 (plurality opinion) (holding informed consent provisions requiring "truthful, nonmisleading information about the nature of the procedure, the attendant health risks and those of childbirth, and the 'probable gestational age' of the fetus" did not impose undue burden), with Thornburgh v. American Coll. of Obst. & Gyn. , 476 U.S. 747, 764, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (holding informed consent provisions were facially unconstitutional for requiring patient to be informed of " 'detrimental physical and psychological effects' " and " 'particular medical risks' " of abortion, because it tended to "increase the patient's anxiety, and intrude upon the physician's ... professional judgment"). The majority signals this consequence when citing to McDonald, A Hellerstedt Tale: There and Back Again ?, 85 U. Cin. L. Rev. 979, 1005-06 (2018), regarding scrutiny of governmental persuasion regulations. Op. at 497-98. I simply do not understand why the majority would stop short in explaining what its ruling today means.
I am even more puzzled by the majority's suggestion that on remand "the State may certainly raise to the trial court any interests it claims are compelling , including those it mentioned at oral argument before this court, and show why S.B. 95 is narrowly tailored to those interests." (Emphasis added.) Op. at 501. How does this comport with strict scrutiny analysis? The interests mentioned by the State do not fit the pre- Casey federal strict scrutiny standard except for patient safety. Interests such as promoting potential life before viability, protecting the dignity of life, and protecting medical ethics, are permissibly advanced under a federal undue burden analysis but not strict scrutiny. Compare Casey , 505 U.S. at 872, 112 S.Ct. 2791 (plurality opinion) (noting rigid trimester framework "sometimes contradicted the State's permissible exercise of its powers" to further its interest in promoting fetal life), with Roe , 410 U.S. at 163, 93 S.Ct. 705 (state's interest in mother's health becomes compelling approximately at end of first trimester, and interest in potential life becomes compelling at viability). And this litany of interests does not square with the majority's declaration that "to justify S.B. 95, the State must establish a compelling interest-one that is 'not only extremely weighty, possibly urgent, but also rare-much rarer than merely legitimate interests and rarer too than important interests.' " Op. at 493 (quoting Fallon, Strict Judicial Scrutiny , 54 UCLA L. Rev. 1267, 1273 [2007] ).
But if the majority is really open to such claims being considered "compelling" state interests, I fail to see how this remains a "strict scrutiny" standard and not equally as vulnerable to "leaving judges to subjectively gauge" what is a state interest as the majority complains now occurs with federal undue burden under Casey . Op. at 495. The majority decision is fraught with these mixed signals, which the trial court will need to decode before it can proceed.
I also doubt the trial court will find helpful the out-of-state cases listed by the majority as applying strict scrutiny in the abortion context. Op. at 496-97. From my reading, they are inapplicable to the majority's stated standard or inconsistent in their resolution under similar facts. This presents several concerns.
For instance, Hope Clinic , 372 Ill.Dec. 255, 991 N.E.2d 745, confuses things because it did not explicitly analyze the abortion issue under strict scrutiny. It noted Illinois employs a limited lockstep approach when the *510 state and federal constitutional language is nearly identical and departs from the federal construction only if there is a reason to do so. 372 Ill.Dec. 255, 991 N.E.2d at 757. Hope Clinic was decided in 2013, so it would have employed undue burden under Illinois caselaw. But without explanation, the Hope Clinic court discussed pre- Casey federal decisions to determine whether the challenged statute was constitutional. See 372 Ill.Dec. 255, 991 N.E.2d at 766-69. This may explain why the Iowa Supreme Court included Hope Clinic among the court decisions employing undue burden. See Planned Parenthood , 915 N.W.2d at 253. The inescapable conclusion is that Hope Clinic will not assist the trial court on remand.
Among other decisions identified by the majority, Alaska, California, and Tennessee courts recognized compelling interests beyond those accepted under Roe 's strict scrutiny jurisprudence. State v. Planned Parenthood of Alaska , 171 P.3d 577, 579 (Alaska 2007) ("We decide today that the State has an undeniably compelling interest in protecting the health of minors and in fostering family involvement in a minor's decisions regarding her pregnancy."); American Academy of Pediatrics v. Lungren , 16 Cal. 4th 307, 348, 66 Cal.Rptr.2d 210, 940 P.2d 797 (1997) (plurality opinion) ("We agree that the state's interests in protecting the health of minors and in preserving and fostering the parent-child relationship are extremely important interests that rise to the level of 'compelling interests' for purposes of constitutional analysis."). Compare Sundquist , 38 S.W.3d at 17 ("In our view, the State has an interest in promoting the health and safety of all its citizens, and the State clearly has a compelling interest in maternal health from the beginning of pregnancy."), with Roe , 410 U.S. at 163, 93 S.Ct. 705 ("With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester."). But, once again, this just means the trial court will have to guess whether it can ignore the pre- Casey federal jurisprudence and expand the state "interests" that might be "compelling."
Another problem comes when considering particular statutory provisions because the state courts the majority lists have rendered conflicting rulings. For example, when a parental consent statute was challenged, the Florida court concluded there was no compelling state interest. In re T.W. , 551 So.2d at 1195. But Alaska and California courts decided similar statutes sufficiently implicated a compelling state interest but were unconstitutional because they were not the least restrictive means of achieving it. Planned Parenthood of Alaska , 171 P.3d at 579 ; American Academy of Pediatrics , 16 Cal. 4th at 348, 356-57, 66 Cal.Rptr.2d 210, 940 P.2d 797 (plurality opinion). And when laws prohibiting public funding for certain abortions were challenged, the Minnesota court held the prohibition unconstitutional, but the Florida court did not even view a funding limitation as implicating a woman's right to abortion. Compare Women , 542 N.W.2d at 27, 31-32 (noting statute funding childbirth-related medical services but prohibiting similar funding for medical services related to therapeutic abortion impacted a woman's right to decide to terminate her pregnancy), with Renee B. v. Fl. Agency for Health Care , 790 So.2d 1036, 1041 (Fla. 2001) (acknowledging poverty makes it difficult for some women to exercise a constitutional right but the challenged regulation did not implicate a right to abortion because it did not impose any restriction to existing abortion access).
It is also worth noting that unlike other state courts that held implication of an abortion right triggers strict scrutiny, courts in California may not review every abortion case based on a privacy right under strict scrutiny. In American Academy of Pediatrics , 16 Cal. 4th at 329-32, 66 Cal.Rptr.2d 210, 940 P.2d 797 (plurality opinion), the court held a balancing test is appropriate when intrusion is "so insignificant or de minimis"; only "significant" intrusion calls for strict scrutiny. 16 Cal. 4th at 331-32, 66 Cal.Rptr.2d 210, 940 P.2d 797.
Arguably, Armstrong , 296 Mont. 361, 989 P.2d 364 (statute restricting performance of abortions to licensed physicians fails strict scrutiny), might come factually closer to our Kansas question on Dilation and Evacuation *511 procedures if the issue on remand becomes patient health. But I question its analytical value for this S.B. 95 challenge. Montana's Constitution has an explicit strict scrutiny test written into it, as well as a special privacy provision that "adheres to one of the most stringent protections of its citizens' right to privacy in the United States-exceeding even that provided by the federal constitution." 296 Mont. at 373-74, 989 P.2d 364. Under those circumstances, Armstrong held:
"Simply put, except in the face of a medically-acknowledged, bona fide health risk, clearly and convincingly demonstrated, the legislature has no interest, much less a compelling one, to justify its interference with an individual's fundamental privacy right to obtain a particular lawful medical procedure from a health care provider that has been determined by the medical community to be competent to provide that service and who has been licensed to do so. To this end, it also logically and necessarily follows that legal standards for medical practice and procedure cannot be based on political ideology, but, rather, must be grounded in the methods and procedures of science and in the collective professional judgment, knowledge and experience of the medical community acting through the state's medical examining and licensing authorities." 296 Mont. at 385, 989 P.2d 364.
Our Kansas Constitution contains no similar explicit strict scrutiny standard provision, so Armstrong 's analytical relevance is suspect. And even so, if the suggestion is that our Kansas controversy can be judged by Montana's standards, I again have to wonder what is left for trial because the Kansas legislation has not been claimed by the State to be based on "medically-acknowledged, bona fide health risks." 296 Mont. at 385, 989 P.2d 364. So unless the majority wants to move beyond Roe , 410 U.S. at 163, 93 S.Ct. 705 (recognizing the state's compelling interests in maternal health only after the first trimester and in potential fetal life only after viability), and closer to Casey , 505 U.S. at 846, 112 S.Ct. 2791; 505 U.S. at 882-83, 112 S.Ct. 2791 (plurality opinion) (not only recognizing but considering the state's legitimate interests in maternal health and potential fetal life from the outset of pregnancy in assessing a challenged governmental action), there is no compelling state interest to begin the analysis. See Women, 542 N.W.2d at 32 (holding state interest in potential life does not become compelling before viability, citing Roe ; concluding the challenged statute was unconstitutional as it applied at all stages of pregnancy). But if protecting potential life is a "compelling" state interest in the majority's view, it should just say so.
Unlike Roe and the Montana decision, the recent Iowa Supreme Court case also cited by the majority conflicts because the Iowa court held there is a compelling state interest in promoting potential life and helping people make informed choices about abortion. Planned Parenthood , 915 N.W.2d at 241 (challenge to a mandatory, 72-hour waiting period requirement for all abortions). That court held the statute failed "strict scrutiny" because it was not narrowly tailored and did not further the state's claimed interest in promoting potential life. 915 N.W.2d at 243-44.
In my reading, the Iowa "strict scrutiny" inquiry is much like Hellerstedt in that it is based on credible trial evidence and employs an analytical process tailored to the interests at stake, which in Iowa include promoting potential life and making informed choices about abortion. The Iowa court based its determination on evidence showing waiting periods do not change women's decisions whether to have an abortion. See 915 N.W.2d at 239-40 ("A regulation must further the identified state interest that motivated the regulation not merely in theory, but in fact.").
Put another way, the amici American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, and Catholic Medical Association lay out arguments they claim are evidence based concerning fetal pain. The State chose not to present such evidence at the temporary injunction hearing; but if it had, and a trier of fact agreed, would the majority hold this would have been a waste of time under its strict scrutiny standard? Said yet another way, if the State really can prove *512 to the court's satisfaction fetal pain from this second-trimester procedure, would not the majority concede that legislation narrowly tailored to address that fact could pass constitutional muster?
With such uncertainty front and center, this court has a duty to provide more detailed direction in a case as complex and divisive as this one. And we have done so before. See, e.g., Gannon v. State , 298 Kan. 1107, 1171, 319 P.3d 1196 (2014) (remanding to apply a newly clarified constitutional standard under Kansas Constitution's Article 6, Section 6[b] ). More thorough guidance concerning a Kansas test that similarly spells out the constitutional standard at issue would help the trial court fulfill its responsibilities and expedite this controversy's final resolution.
Notably, the majority flirts with Hellerstedt when deciding it is unnecessary to return the temporary injunction question to the district court to apply strict scrutiny. Op. at 501 ("[E]ven though we would apply what we view as the more demanding strict scrutiny standard for the State to meet, doing so would not change the conclusions reached by the trial court."). But the majority does not delve deeply enough into Hellerstedt 's analytical process to give the district court any clue about what it should do next. Quite possibly, the majority wants to imply potential life may constitute a compelling state interest simply by returning the case for a trial. But it does not really make any commitment about that when it merely invites the State to advance "any interests it believes compelling." Op. at 503. Nor does it supply a test for the district court to distinguish "compelling" interests from lesser ones in the abortion context. Instead, the majority cites a content-based First Amendment case, a race-based affirmative action case, and a law review article to try and define a distinction, which simply underscores the lack of abortion-related strict scrutiny jurisprudence for the district court to consider. Op. at 496-97. The majority, quite simply, is mistaken when it says "the strict scrutiny standard provides considerable guidance to a trial court" for the controversy presented today. Op. at 503.
To better address these uncertainties, I detail below what I see as Hellerstedt -like parameters appropriate for a Kansas test. At the very least, the district court and parties will have this to ponder for trial purposes.
But before doing that, I need to mention concerns with the dissent's standard, which it characterizes as rational basis "with bite." Op. at 550-51 (Stegall, J., dissenting). It describes this process as looking for a reasonable relationship to the common welfare or otherwise being arbitrary, irrational, or discriminatory. And it approvingly quotes Patel v. Dept. of Licensing and Regulation , 469 S.W.3d 69, 98 (Tex. 2015) (Willett, J., concurring), in explaining that this methodology demands " 'actual rationality , scrutinizing the law's actual basis , and applying an actual test .' " Op. at 550 (Stegall, J., dissenting). There are things about this I don't understand. Let me explain.
At oral argument, I asked the State's counsel a hypothetical: A woman is told she must have an abortion to save her life; does the Kansas Constitution allow her Legislature to forbid this and say she must die? Committed as he was to the State's initial position that section 1 confers no judicially enforceable protections, the State's lawyer noticeably fumbled his response. But what is the answer under the dissent's scrutiny? Is legislating away a woman's chance to avoid death from childbirth irrational? Or arbitrary? I certainly think so.
But under the dissent's rationale, if this life-or-death decision becomes a judicial call-instead of a legislative one-how is that not the creation of a "judicially privileged act of abortion" the dissent excoriates? Op. at 517 (Stegall, J., dissenting). Is this judicial search for rationality or arbitrariness not an exercise in determining court-favored outcomes? See op. at 550-51 (Stegall, J., dissenting). And if a pregnant woman's death is a bridge too far on this continuum, how about great bodily harm, rape, incest, fetal anomalies, or other prospects for an unsafe birth? How about the many other profoundly personal reasons a pregnant woman takes into consideration with her doctor when facing a pregnancy's possible termination? See, e.g., *513 Planned Parenthood , 915 N.W.2d at 214-15, 218. If courts are drawing lines in this high stakes exercise in democratic majority rule, must not the judicial scrutiny needed to draw them be commensurate with what is at stake? Or do we really want to equate childbirth with selling ice cream on public streets? See op. at 542-53 (Stegall, J., dissenting) (suggesting same test applies to all challenged legislative acts, and citing Delight Wholesale Co. v. City of Overland Park , 203 Kan. 99, Syl. ¶ 5, 453 P.2d 82 [1969] ). For me, that question answers itself.
More disturbingly, consider how the dissent's standard perfectly aligns with this notorious passage from our American caselaw:
"In view of the general declarations of the legislature and the specific findings of the Court, obviously we cannot say as a matter of law that the grounds do not exist, and if they exist they justify the result. We have seen more than once that the public welfare may call upon the best citizen for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. [Citation omitted.] Three generations of imbeciles are enough." Buck , 274 U.S. at 207, 47 S.Ct. 584.
The interests at stake for our citizens must dictate the degree of judicial scrutiny given when government seeks to intrude into those interests. See Skinner , 316 U.S. at 546, 62 S.Ct. 1110 (Jackson, J., concurring) ("There are limits to the extent to which a legislatively represented majority may conduct biological experiments at the expense of the dignity and personality and natural powers of a minority-even those who have been guilty of what the majority define as crimes."). The dissent, of course, has the benefit at this stage of simply proposing its new standard in the abstract. But it is a mystery how rational basis "with bite" would actually operate to judicially limit government power when the circumstances are as serious as the complications attendant to a woman's pregnancy.
A Hellerstedt-based test
As explained, my premise is that Hellerstedt 's approach can inform our analysis of S.B. 95 under section 1 of the Kansas Constitution Bill of Rights. I would articulate the Kansas test as follows: When a litigant claims a law unconstitutionally infringes on a pregnant woman's access to abortion, a court must determine whether that law imposes an undue burden on that access. I intentionally use the term "undue burden" because it signals the weighing Hellerstedt contemplates and the scrutiny these circumstances demand, which the majority begrudgingly concedes. Op. at 496 ("We agree with the concurring opinion that both the undue burden and strict scrutiny tests start with determining how governmental action burdens or infringes on a right."). And I emphasize this is a Kansas test that going forward should be developed by Kansas courts distinct and independent from any federal abortion standard. This is why the majority's criticisms about Hellerstedt providing a lower level of rigor and being difficult to apply miss the mark. See op. at 494-95, 496-97.
I would see the district court's analytical path as first needing to determine whether, and to what extent, a challenged legislative or administrative action burdens abortion access. Next, the court would need to determine to what extent that action directly promotes valid state interests. These findings must be based on evidence, including medical evidence, presented in judicial proceedings. Mere deference to legislative or administrative findings or stated goals would be insufficient.
From these independent judicial findings, the court would then be in a position to decide whether the challenged action unduly restricts abortion access when the burdens are viewed in light of the action's actual benefits to the state's valid interests. The burdens, however slight, must be sufficiently justified by the actual benefits. See Robertson, *514 Whole Woman's Health v. Hellerstedt and the Future of Abortion Regulation , 7 UC Irvine L. Rev. 623, 631 (2017) ("If there was no actual benefit, then more than de minimis burdens, even if not a substantial obstacle, would be 'undue.' To hold otherwise would remove most judicial scrutiny of legislation in the abortion area and impair the dignity, not only of women, but of law itself.") (citing Greenhouse & Siegel, Casey and the Clinic Closings: When "Protecting Health" Obstructs Choice , 125 Yale L.J. 1428 [2016] ).
The Hellerstedt Court described the analytical process this way when agreeing the district court in that case correctly applied the legal standard:
"[The district court] did not simply substitute its own judgment for that of the legislature. It considered the evidence in the record-including expert evidence, presented in stipulations, depositions, and testimony. It then weighed the asserted benefits against the burdens." 136 S.Ct. at 2310.
The above is an evidence-based analysis that compares actual benefits and burdens to support or oppose the government action in controversy. And while I appreciate it does not employ the "strict scrutiny" terminology the majority seems to prefer, I am confident this inquiry captures the majority's proposition that the challenged state action must actually impair abortion access, and its concern that any impairment be appropriately tailored to promote that state interest. See op. at 497-98; see also Hellerstedt , 136 S.Ct. at 2309-10; 136 S.Ct. at 2326 (Thomas, J., dissenting) ("The majority's undue-burden test looks far less like our post- Casey precedents and far more like the strict-scrutiny standard that Casey rejected, under which only the most compelling rationales justified restrictions on abortion."). It also remains mindful of the State's valid interests by recognizing greater regulatory latitude as the conflict with individual rights diminishes. See Planned Parenthood , 915 N.W.2d at 241 (recognizing the state's interests in protecting potential life beyond Roe 's trimester framework). Most importantly, this inquiry's real world application in a courtroom, based as it must be on evidence, will protect a pregnant woman's constitutional rights from legislative or administrative pretext.
Given this as my test, I explain next its use to determine whether the district court correctly granted the temporary injunction. That is, after all, the question in this appeal.
The test's application
It is legitimate to wonder whether remand is appropriate. See Gannon , 298 Kan. at 1171, 319 P.3d 1196 (remanding to apply a newly clarified constitutional standard under Kansas Constitution's Article 6, Section 6[b] ). The majority holds remand is unnecessary because S.B. 95 effectively eliminates D & E procedures when coupled with our state's existing partial-birth restriction in K.S.A. 65-6721, so the practical result is squarely prohibited by Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). Op. at 500-01. The dissent would remand to apply rational basis with bite. Op. at 551-52.
I would hold remand is unnecessary based on the lopsided evidentiary record favoring plaintiffs so far in these proceedings. As a practical matter, the State made no evidence-based defense for this legislation, even though at times its arguments on appeal claim it did by pointing to incomplete quotes from a few medical journals.
As a defense strategy, the State's decision to rely on lawyer interpretation of medical journals-rather than using actual medical professionals-is at best curious given the pivotal role expert testimony typically plays in medically related litigation. See, e.g., Puckett v. Mt. Carmel Regional Med. Center , 290 Kan. 406, 435, 228 P.3d 1048 (2010) (expert testimony generally required in medical malpractice cases to establish applicable standard of care and prove causation). In contrast, plaintiffs submitted sworn affidavits from medical doctors, who detailed: (1) their training, qualifications, and experience upon which they based their testimony and opinions; (2) explanations regarding the relevant medical procedures and opinions about their relative safety and risks; (3) the doctors' professional judgments about the medical considerations concerning those procedures and the likely adverse impacts from S.B. 95; and (4) supportive medical research for their opinions.
*515 Based on its hearing record, the district court expressly held the State did not dispute the facts plaintiffs outlined in supporting their temporary injunction request. Its order granting the temporary injunction found:
• The D & E procedure prohibited by the legislation is used for 95% of second trimester abortions.
• The State proposed three alternative procedures to D & E permitted by the legislation: labor induction, induction of fetal demise using an injection, and induction of fetal demise using umbilical cord transection.
• Labor induction is used in approximately 2% of second-trimester abortion procedures. It requires an inpatient labor process in a hospital lasting between five-to-six hours and up to two or three days. Labor induction includes increased risks of infection when compared to D & E and is medically inadvisable for some women.
• An injection of digoxin may be administered either by transabdominal or transvaginal injection. "Injections to induce demise using digoxin prior to D & E are not practiced prior to 18 weeks gestation, and the impact of subsequent doses of digoxin, required in cases [when] a first dose is not effective, is virtually unstudied. Research studies have shown increased risks of nausea, vomiting, extramural delivery, and hospitalization."
• "Umbilical cord transection prior to a D & E is not possible in every case. Requiring transection prior to a D & E increases procedure time, makes the procedure more complex, and increases risks of pain, infection, uterine perforation, and bleeding." Using transection to induce fetal demise has only been discussed in a single retrospective study, the authors of which note its main limitation is a " 'potential lack of generalizability.' "
• "There is no established safety benefit to inducing demise prior to a D & E procedure."
Standard of review
Generally, appellate courts review a district court's grant or denial of injunctive relief for abuse of discretion. To issue a temporary injunction, five factors are necessary: (1) a substantial likelihood of success on the merits; (2) a reasonable probability of suffering irreparable future injury to the movant; (3) a lack of obtaining an adequate remedy at law; (4) the threat of suffering injury outweighs whatever damage the requested injunction may cause the opposing party; and (5) the injunction, if issued, will not be adverse to the public interest. Downtown Bar and Grill v. State , 294 Kan. 188, 191, 273 P.3d 709 (2012). A court abuses its discretion when its action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. Biglow v. Eidenberg , 308 Kan. 873, 893, 424 P.3d 515 (2018).
Discussion
The State does not claim the district court made any error of fact. See majority op. at 469; Hodes , 52 Kan. App. 2d at 275, 368 P.3d 667. And those facts sufficiently establish that S.B. 95 unduly restricts abortion access. This leaves the State with nowhere to go on appeal except to argue as a matter of law that the Legislature is free to do whatever it wants. That strategy plainly fails across the board with this court as discussed. From my vantage point, under the applicable abuse of discretion standard, there is nothing to remand as far as the temporary injunction motion is concerned.
The State repeatedly avows in its briefing that it produced "evidence" about the legislation's alternative medical procedures. But it did no such thing. The State is referencing medical journals cited in its arguments opposing the temporary injunction. But these articles were never offered into evidence or for that matter even given to the trial court. And they are not part of our record on appeal. I had to search them out across multiple library resources, including locating some behind website paywalls, just to get a look. In my experience, it is a strange defense strategy for a litigant to play hide and *516 seek with "evidence" characterized as supporting its position.
Nevertheless, the State's briefing about these articles supplied only partial quotes that were recited as prelude to its lawyers' arguments about what those medical passages meant. There is a long-standing admonition we tell our juries that comes to mind: the arguments of counsel are not evidence. PIK Civ. 4th 102.04 (2010 Supp.). Plaintiffs, on the other hand, offered sworn testimony expressing expert medical opinions. Their references to medical journals only bolstered the doctors' stated professional opinions. Plaintiffs did not attempt to use those articles by themselves to establish medically based facts-the doctors' sworn testimony did that. The State's approach was starkly different; and, as explained, that difference is significant. See Puckett , 290 Kan. at 435, 228 P.3d 1048 (discussing the evidence's sufficiency).
Worse yet, the State's advocates deleted findings from those medical journals that flatly contradicted their arguments supporting S.B. 95. Consider this example, offered at least twice by the State in its fractured quotation from the article, Diedrich and Drey, Society of Family Planning, Induction of Fetal Demise Before Abortion, SFP Guideline 20101, 81 Contraception 462, 464 (2010). Note particularly the ellipses in the State's quoted material:
" 'It is difficult to determine whether or not a fetus has the ability to perceive pain.... By inducing fetal demise the issue of whether the fetus could experience pain during the abortion can be circumvented ..., which is another reason feticide may be offered by some providers.' " Appellants' Brief, at 7; Defendants' Response Opposing Plaintiffs' Motion for Temporary Restraining Order and/or Temporary Injunction, at 24.
Now consider that same passage in its original published form, with the State-excised portion italicized:
"It is difficult to determine whether or not a fetus has the ability to perceive pain, which by its definition requires cortical interpretation of noxious stimuli. A multidisciplinary review of the medical evidence concluded that a fetus cannot experience pain until 29 weeks of gestation at the earliest, when thalamocortical connections are first present. In the past, withdrawal reflexes and the release of hormonal stress hormones have been indicated as evidence of fetal pain perception. This review shows evidence that both withdrawal reflexes and hormonal stress hormones can be elicited by nonpainful stimuli and can occur without conscious cortical processing. Therefore, the best indicator as to when a fetus has potentially the capacity to experience pain is the development of the thalamocortical axons, which do not occur until at least 29 weeks of gestational duration; however, their functionality within the intrauterine environment has not been determined. With the difficulty of establishing any clear way to measure fetal pain and the lack of specific markers for fetal pain, any potential pain of the means of inducing fetal demise cannot be assessed either. By inducing fetal demise the issue of whether the fetus could experience pain during the abortion can be circumvented, which is another reason feticide may be offered by some providers." (Emphasis added.)
Setting aside the stunning lack of candor with the court the State's machinations exemplify, if we view these journals as "evidence," as the State argues we should, the italicized passage only bolsters plaintiffs' expert testimony that S.B. 95 is unjustified from a fetal pain perspective-at least until 29 weeks into the gestational process. No wonder the State tried to hide it.
It is also unclear from a benefits/burdens perspective how S.B. 95 furthers any state interest from a fetal pain standpoint. Existing law already restricts abortion on "a pain-capable unborn child." See K.S.A. 65-6724(a). So under my suggested test, S.B. 95's burdens are unjustified as shown by the evidence presented at the temporary injunction hearing.
Given the current record on appeal, and applying what I see as the appropriate Kansas test, I would hold the district court did not abuse its discretion in issuing the temporary *517 injunction against S.B. 95's enforcement pending trial on the merits.
Conclusion
All agree this court should interpret the Kansas Constitution in accordance with the framers' intent and the values expressed by its words. Both the majority and the dissent devote nearly 108 pages discussing historical lineage for those words. And it is a demanding read. I hope those reviewing my colleagues' history lessons will accept the exercise for what it obviously is-hard working judges trying to honestly answer the questions presented in good faith. But for me, an originalism search gets us only so far when divining meaning for words with such obvious open-ended qualities as "liberty" or "inalienable natural rights." The historical back-and-forth really just boils down to how much weight is given one selected fact over another.
I believe our framers had to understand this interpretative dynamic and picked those particular words because they require contemporary context. This means we must apply what "liberty" and "inalienable natural rights" mean in the real world today for a pregnant woman. In doing so, that necessarily demonstrates meaningful limitations on the government's ability to elbow its way into the decisions she must make concerning her pregnancy.
The district court did not abuse its discretion by temporarily enjoining S.B. 95's enforcement pending trial.
* * *